In re MID–CITY HOTEL ASSOCIATES, a Minnesota limited partnership, Debtor.

MID–CITY HOTEL ASSOCIATES, a Minnesota limited partnership, Plaintiff,

v.

The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Defendant.

Bankruptcy No. 3–89–1458.
Adv. No. 3–89–273.

United States Bankruptcy Court, D. Minnesota, Third Division.

May 25, 1990.

Mark J. Kalla, Oppenheimer, Wolff & Donnelly, Minneapolis, Minn., for defendant.

Hart Kuller and Charles A. Durant, Winthrop & Weinstine, St. Paul, Minn., for plaintiffs.

Mary Laverdure, Lambert & Boeder, Wayzata, Minn., for plaintiff's Unsecured Creditors Committee.

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT IN PART, AND GRANTING PARTIAL SUMMARY JUDGMENT TO DEFENDANT

GREGORY F. KISHEL, Bankrtupcy Judge.

This adversary proceeding came on before the Court on November 30, 1989, upon Plaintiff's motion for summary judgment. Plaintiff appeared by its attorneys, Hart Kuller and Charles A. Durant. Defendant appeared by its attorney, Mark J. Kalla. Plaintiff's Unsecured Creditors Committee

1.  The original lessor was a group of individuals. An entity known as "Bedrock Partnership" cur-

appeared by its attorney, Mary F. Laverdure. Upon the moving and responsive documents, arguments of counsel, and the other files and records in this adversary proceeding, the Court makes the following order.

## FINDINGS OF FACT

Plaintiff is a debtor in possession under Chapter 11, having filed a petition for reorganization on April 21, 1989. Plaintiff owns and operates a hotel known as the Minneapolis Metrodome Hilton. This facility was constructed in 1979, using financing initially provided by the Northwestern National Bank of Minneapolis ("Northwestern National"). Plaintiff owns the hotel building, and all of its outbuildings, fixtures, and associated personalty; it occupies the underlying real estate pursuant to a fifty-one year ground lease from the fee owners of that real estate, dated September 1, 1978.[1] In 1980, Defendant purchased Northwestern National's rights; currently, it is Plaintiff's largest secured creditor.

The documentary facts are uncontested and are relatively straightforward. On February 15, 1979, Plaintiff executed a promissory note in the face amount of $6,200,000.00 in favor of Northwestern National. On its face, Plaintiff and Northwestern National contemplated Defendant's future purchase of the note from Northwestern National. On page 3 of the note, the parties provided:

> This Note and the interest thereon are secured by a Mortgage of even date herewith on property located in Hennepin County, Minnesota and by that certain Assignment of Rentals of even date herewith; and this Note and the holder hereof are entitled to all of the benefits and security provided by said Mortgage, and Assignment of Rentals and all agreements supplemental thereto. This Note is to be construed according to the laws of Minnesota.
>
> In the event of acceleration of the indebtedness because of default under either this Note or the Mortgage, [Defendant's]

rently holds the lessor's interest, under assignment from those individuals.

remedies shall be limited to taking such action with respect to the property subject to the Mortgage in any assignment of lease or assignment of rentals or other security held by [Defendant] as mortgagee or as may be otherwise available to [Defendant] as mortgagee under the laws of the State of Minnesota, and no deficiency judgment or any other judgment personally binding upon [Plaintiff] or any general partner thereof will be sought.

On the same date, Plaintiff and the fee owners of the real estate on which Plaintiff was to build the hotel executed a mortgage and security agreement in favor of Northwestern National ("the mortgage"). Under that instrument, the fee owners granted a mortgage in the real estate to Northwestern National and its successors and assigns, and Plaintiff granted Northwestern National and its successors and assigns a mortgage or security interest in Plaintiff's lessee's interest in the real estate. Both such liens were granted as security for the debt evidenced by the $6,200,000.00 promissory note. As further security, this document provided:

> The Mortgagors do by these presents GRANT, BARGAIN, SELL, MORTGAGE, CONVEY, TRANSFER and ASSIGN to Mortgagee:
>
> All right, title and interest of the Mortgagors now owned or hereafter acquired in and to all and singular the estates, tenements, hereditaments, privileges, easements, franchises and appurtenances belonging or in any wise appertaining to the Real Estate and the reversions, rents, issues, revenues and profits thereof, including (a) all interest of FEE OWNER under the Ground Lease and in and to all present and future leases, tenancies and occupancies of space in the buildings and in and to any sublease of the aforementioned property ... and (b) all interests of [Plaintiff] in all rents, issues, profits, revenues, royalties, bonuses, rights and benefits due, payable or accruing (including all deposits of money as advanced rent or for security) under any and all leases or subleases and renewals thereof of said property (includ-

ing during any period allowed by law for the redemption of said property after any foreclosure or other sale), together with the right, but not the obligation, to collect, receive and receipt for all such rents and apply them to the indebtedness secured hereby and to demand, sue for and recover the same when due or payable ... By acceptance of this Mortgage, the Mortgagee agrees, not as a limitation or condition hereof, but as a personal covenant available only to the Mortgagors and subsequent owners of said property, that until an event of default shall occur giving the Mortgagee the right to foreclose this Mortgage, Mortgagors may collect, receive and enjoy such rents.

> . . . . .
>
> The Mortgagors do by these presents further GRANT, BARGAIN, SELL, MORTGAGE CONVEY, TRANSFER and ASSIGN to Mortgagee all right, title and interest of the Mortgagors in and to:
>
> . . . . .
>
> (f) All other rents, issues and profits of the Real Estate from time to time, accruing, whether under leases or tenancies now existing or hereafter created, reserving to Mortgagors, however, so long as Mortgagors are not in default hereunder, the right to receive and retain such rents, issues and profits.

On page 16, the Mortgage and Security Agreement further noted:

> The rights contained herein are in addition to and shall be cumulative with the rights given in the Assignment of Rents and Assignment of Lease (herein jointly called "Assignments") of even date herewith, assigning the leases, rents and profits of the premises and shall not amend or modify the rights in such Assignments.

On the same date, Plaintiff and the fee owners executed a separate written assignment of rents in favor of Northwestern National ("the collateral assignment"). In pertinent part, that document provided:

> FOR VALUE RECEIVED, [Plaintiff] and Fee Owner hereby grant, transfer

and assign to Assignee the immediate and continuing right to receive and collect all of the respective rights to all rents, income, profits and issues of any kind, except such rights of the Fee Owner under the Ground Lease dated September 1, 1978, by and between [Plaintiff] and Fee Owner (the "Ground Lease") (collectively the "Rents") arising out of or payable or collected from the real property ("Premises") described in Exhibit "A" attached hereto, and all leases and agreements for the leasing, use or occupancy of the Premises now, heretofore or hereafter entered into, except the Ground Lease, ("leases"), together with all guarantees therefor and all renewals and extensions thereof, for the purpose of securing [all indebtedness under the $6,200,000.00 promissory note, and Plaintiff's performance of all other obligations under the note and mortgage] ...

Both of these instruments were registered in the office of the Registrar of Titles for Hennepin County, Minnesota, on March 26, 1979. On March 28, 1979, a UCC–1 form was filed with the office of the Minnesota Secretary of State, giving notice that Plaintiff had granted Northwestern National a security interest in its interest in a management contract and the franchise agreement for the hotel, all materials intended for the construction of the hotel, and "all machinery, apparatus, equipment, fittings, fixtures and articles of personal property," followed by a lengthy enumeration of types of tangible personalty.

In January, 1980, Northwestern National assigned its rights under the note and security documents to Defendant. On January 21, 1980, Defendant filed a UCC–3 form with the Secretary of State, evidencing Northwestern National's assignment of its rights to Defendant. Defendant has filed two continuation statements with the same office since then. On January 24, 1980, Plaintiff, Defendant, and the fee owners entered into a "Modification Agreement" which increased the principal amount stated as owing in the recitals of the mortgage, and added certain other nonmaterial language to the mortgage. This agreement otherwise left all provisions of

the security documents intact. On February 7, 1980, the same parties executed a second "Modification Agreement" under which the principal amount of the promissory note itself was increased to the same figure stated in the first modification agreement, and altered the payment terms under the note. This agreement also left all prior security provisions intact.

Since it opened the hotel, Plaintiff has rented rooms to guests. It has also operated restaurant and bar facilities on the premises. Since the commencement of its Chapter 11 case, Plaintiff has generated revenues from all three of these sources. There is no evidence of record in this adversary proceeding as to the share of Plaintiff's gross revenues which each respective source generates.

## DISCUSSION

In this adversary proceeding, Plaintiff requests an adjudication that the revenues which it generates from its hotel operations do not constitute "rents" under either the assignment in the mortgage or the collateral assignment. The consequence, of course, would be that none of Plaintiff's revenues are impressed with a lien in favor of Defendant, and that the revenues are Plaintiff's unencumbered property. In the alternative, Plaintiff argues that its revenues are legally characterizable as "accounts receivable" or their proceeds, a form of personalty as to which any security interest must be perfected via the filing of a financing statement in the office of the Minnesota Secretary of State pursuant to MINN.STAT. § 336.9–401(1)(d). It maintains that Defendant failed to file a financing statement in a form sufficient to perfect a security interest in this class of asset. As ultimate relief on this second theory, Plaintiff seeks an adjudication that Defendant's security interest in the revenues is unperfected and subject to avoidance pursuant to 11 U.S.C. § 544(a).

Defendant, of course, strenuously argues against both theories of relief. The issue is of some consequence to both parties. It bears on the ultimate entitlement to the net

revenues which Plaintiff has generated since its bankruptcy filing. Those funds have been disbursed to Defendant under the terms of successive cash collateral orders, but under an explicit reservation to Plaintiff of the right to challenge Defendant's entitlement to them.[2] The outcome of this adversary proceeding also will have some effect on the terms of the treatment of Defendant's claim in Plaintiff's plan of reorganization, which is presently in the process of revision.

*A. Threshold Issue: Whether Plaintiff's Revenues Constitute "Rents, Issues, Revenues and Profits" or "Rents, Income, Profits and Issues" of the Underlying Real Estate, Subject to Defendant's Claims under the Assignments of Rents.*

As its frontal attack on Defendant's position under the assignments of rents, Plaintiff argues that the term "rents" must be restricted to income arising out of a landlord-tenant relationship—that relationship based on a tenancy of real estate for a fixed term, and those funds paid in consideration for the exclusive use and occupancy of such real estate.

Plaintiff relies heavily upon the analysis in *In re Ashkenazy Enterprises, Inc.*, 94 B.R. 645 (Bankr.C.D.Cal.1986). In *Ashkenazy Enterprises*, the court distinguished between "rents," as paid in consideration for use and occupancy of leased premises

under a landlord-tenant relationship regulated by state statute, and "rates" for rooms, as paid by a licensee-guest to the host-owner of a hotel under a relationship regulated by different provisions of state law.

In the latter case, the *Ashkenazy* court concluded, the guest took no legally-cognizable interest in the underlying real estate; rather, the guest contracted with the host for the provision of a variety of *services* including the provision of a room but extending far beyond the right to occupancy. In the opinion of the *Ashkenazy* court, a hotel guest pays primarily for the additional "services and amenities," rather than for the occupancy of a room; the court categorized the latter as no more than "a bare right to use." *See* 94 B.R. at 647. The court also assigned great (perhaps conclusive) weight to the fact that California statute established a regulatory scheme of rights and duties for the landlord-tenant relationship which specifically excluded the innkeeper-guest relationship from its governance, and that California statutory law otherwise distinguished between the two types of relationships. *Id.*

In further support of its argument, Plaintiff cites *In re Greater Atlantic & Pacific Investment Group, Inc.*, 88 B.R. 356 (Bankr.N.D.Okla.1988), and (though the referenced conclusion is more implicit than explicit) *In re Kearney Hotel Partners*, 92 Bankr. 95 (Bankr.S.D.N.Y.1988).[3]

---

**2.** This reservation, part of Plaintiff's offer of adequate protection which the Court approved, conclusively disposes of Defendant's peripheral argument that Plaintiff is now estopped from arguing that the revenues are not its collateral. *See In re Greater Atlantic & Pacific Investment Group, Inc.*, 88 B.R. 356, 359–60 (Bankr.N.D. Okla.1988).

**3.** It also cites, as persuasive authority, *In re Zeeway Corp.*, 71 B.R. 210 (Bankr. 9th Cir.1987), and *In re Corner Pockets of the Southwest, Inc.*, 85 B.R. 559 (Bankr.D.Colo.1988). These cases involved debtors which operated, respectively, an automobile raceway and a restaurant/billiard parlor; in both, the courts concluded that revenues from the debtors' operations were not encumbered by an assignment of rents. These cases' factual dissimilarity renders them something less than fully-arguable authority—even if the courts in both cases utilized analyses which

distinguished between "rents, issues, or profits derived from utilization of the land" on the one hand, and, on the other, income generated from events which occurred upon the land, or services which were provided on the land. In these courts' view, the latter economic activity and its fruits had no more than an incidental connection with the land. In this Court's view, the difference between the nature of those debtors' businesses and the present debtor's business is so great as to make the framing of any common rule difficult. The paucity of authority under Minnesota state law—which, after all, is the governing precedent—is such as to discourage any broad pronouncement by a federal court. The analysis adopted today is limited to economic activity of the specific nature of this debtor's business; this decision should not be read as emblematic of a universal rule which can extend beyond a case involving a debtor which operates a hotel.

In response, Defendant cites *In re Morning Star Ranch Resorts*, 64 B.R. 818 (Bankr.D.Colo.1986) and *In re Oak Glen R–Vee*, 8 B.R. 213 (Bankr.C.D.Cal.1981). The debtor in *In re Morning Star Ranch Resorts* operated a motel/resort facility; that in *Oak Glen R–Vee* operated a recreational vehicle park. In both of these cases, the courts assumed—entirely without discussion—that the revenues from the debtors' operations constituted "rents" or "income, issues and profits" from the underlying real estate, which for the purposes of 11 U.S.C. § 363 was then cognizable as cash collateral under pre-petition assignments. Unfortunately, it does not seem that the parties in either of these cases joined the issue at bar—whether the income-streams from the respective debtors' operations actually fell within the ambit of assets encumbered under the pre-petition assignments, as a matter of nonbankruptcy law.

In the bankruptcy context, this is an issue of first impression in this District and Circuit. In minor part, it can be resolved without going beyond the four corners of one of the relevant instruments. The assignment of rents in the body of the mortgage gives Defendant the general right to the "rents, issues, revenues and profits" of the underlying real estate, which was to include Plaintiff's "interests ... in all rents, issues, profits, [and] revenues ... payable ... under any and all leases or subleases ... of said property ..." The latter sub-category clearly limits Defendant to recovery of rents from leasehold tenants of Plaintiff, as would be understood under state law. Such tenants could include a lessee-operator of the entire hotel, had Plaintiff entered into such an arrangement, or a lessee operating a related service business out of space on the hotel premises, such as a restaurant, hair salon, newsstand, or convenience store. Plaintiff has no such commercial tenants. Defendant has no right to Plaintiff's revenues under color of this sub-category of the security which Plaintiff granted to Defendant.

However, this provision is only a non-exclusive [4] illustration partially clarifying the general phrase "rents, issues, revenues and profits," to which Defendant has an assignment under the mortgage itself. The general phrase obviously is meant to be broader than the illustrative example. Too, the collateral assignment independently establishes Defendant's right to "all rents, income, profits and issues *of any kind,* ... arising out of or payable or collected from the real property ..." (emphasis added). By its terms, this language evidences an intent to grant rights in something more than just the rents from commercial leases of the space on the property, as the phrase "and leases and agreements for the leasing, use or Occupancy of the Premises" follows the quoted language as an indication of an included or additional category of asset subject to this assignment.

■ The question, then, is whether the revenues fall within the classes of security established by the nearly-identical language of these two instruments. This issue is governed by state law. *Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979) (determination of property rights in the assets of a bankruptcy estate—there, as here, the interest of a mortgagee in rents or other income earned by mortgaged property—is governed by state law).

Unfortunately, the Minnesota statutes do not provide any guidance on this specific question; [5] nor is there an extant ruling

---

4. The non-exclusivity is evidenced by the word "including," and the absence of additional verbiage which would establish exclusivity such as "and limited to," or the like.

5. The Court notes that the statutes do distinguish between the landlord-tenant and hotel-guest relationships for at least one purpose, much as do the California statues cited by the court in *Ashkenazy Enterprises. Compare* MINN.STAT. § 327.05 (granting innkeepers, ho-

tel keepers, and keepers of boarding and lodging houses a possessory lien on guests' baggage and other effects, to secure payment of "the proper charges owing such innkeeper ...") with MINN.STAT. § 504.01 (abolishing common-law self-help remedy of distress for rent). Unlike the California codes cited in *Ashkenazy*, however, Chapter 504, governing landlord-tenant relationship, does not in its own terms exclude the innkeeper-guest relationship from its gover-

from the Minnesota state appellate courts which addresses the issue, directly or indirectly.[6] Given this uncertainty, then, it is incumbent on this Court to determine the rule which the Minnesota state courts would then apply if the issue were presented to them. *Carlson v. Tandy Computer Leasing,* 803 F.2d 391, 393 (8th Cir.1986).

For at least some purposes, Minnesota common law has distinguished between the innkeeper-guest relationship and other, more long-term relationships arising out of the consensual use of another's real estate under a transient commercial relationship. *See Asseltyne v. Fay Hotel,* 222 Minn. 91, 23 N.W.2d 357 (1946) (distinguishing between innkeeper-guest and owner-boarder/roomer/lodger relationship, as to liability for casualty loss of customer's personal property on premises). In turn, for at least one other purpose Minnesota law distinguishes between a longer-term transient-occupancy relationship and an actual tenancy of real estate. *See Dewar v. Minneapolis Lodge No. 44, B.P.O.E.,* 155 Minn. 98, 192 N.W. 358 (1923) (lodger is not entitled to the notice of termination of tenancy prescribed by MINN.STAT. § 504.06). Un-

fortunately, there are no Minnesota state-court decisions which treat this hierarchy of relationships arising out of the occupancy of real estate in an explicatory fashion; more to the point, there is no extant Minnesota decision which classifies the nature of a hotel guest's relationship to the underlying real estate.

■ However, it is clear that a hotel guest holds nothing more than a license to enter on the hotel premises, under the general definition of a license under Minnesota law:

> A license with respect to real property is a personal, unassignable, and ordinarily revocable, privilege, conferred in writing or by parol, to perform an act on land without possessing any interest in the land. [citations omitted] ... A licensee is one who has mere permission to use the land, with no interest in or exclusive possession of the land since the licensor retains complete dominion ... [citations omitted].

*In re Huff,* 81 B.R. 531, 534 (Bankr.D. Minn.1988). A tenant, on the other hand,

nance; nor do MINN.STAT. §§ 327.01–.13, the statutes governing hotel operations, expressly exclude landlord-tenant relationships from their regulation. The content of the respective statutes shows the legislature's intent to mutually exclude the two kinds of relationships from the respective regulatory schemes, however; obviously, the courts were to be left to "know one when they saw one," as to one sort of relationship or the other. Regardless of all this, distinctions legislatively drawn for the purpose of establishing rights and duties *as between the parties to the relationship in question* have nothing whatsoever to do with the dispute at hand. This Court respectfully rejects the implicit holding in *Ashkenazy Enterprises* that they should and do.

6. There are three old Minnesota Supreme Court decisions which involve the enforcement by a mortgagee of its asserted rights against the revenues of a hotel. *Fidelity–Philadelphia Trust Co. v. West,* 178 Minn. 150, 226 N.W. 406 (1929) is of no help, as it involves a mortgagee's claim to rents from a lease of certain *signage space* on a hotel's premises, rather than a claim to collections of room rates or food and beverage sales. *Lowell v. Doe,* 44 Minn. 144, 46 N.W. 297 (1890) stands more as a reaffirmation of the availability of the traditional equitable remedy of the appointment of a receiver notwithstanding the then-recent statutory enactments which abrogat-

ed the mortgagee's common-law right to take possession prior to the completion of a foreclosure. Though *Lowell v. Doe* explicitly recognized the right of a receiver appointed under such equitable procedures to collect "the proceeds of the use of the property" to apply to repair costs, real estate taxes, and insurance premiums. However, its recitation of facts did not indicate whether the mortgagor had even executed a formal assignment of rents in, or collateral to, the underlying mortgage. In fact, the *Lowell v. Doe* court explicitly declined to address the issue of whether the mortgagor or the mortgagee was entitled to the surplus revenues after payment of expenses. Only *Cullen v. Minn. Loan & Trust Co.,* 60 Minn. 6, 61 N.W. 818 (1895) embodied *any* recognition, direct or indirect, of a mortgagee's claim to hotel revenues under color of an assignment of rents. Unfortunately, *Cullen* cannot be read as conclusive, binding precedent on the issue. Though the court impliedly recognized the right of the mortgagee to "all the rents which it can by reasonable diligence collect from [the hotel] property," in the last instance the decision stands as direct authority only for the marshalling of all income from a particular property under an assignment of rents to pay that property's debts, before the mortgagee can resort to the income from another tract which was mortgaged to secure the same debt.

holds a legally-cognizable interest in the real estate itself. *State v. Bowman*, 202 Minn. 44, 279 N.W. 214 (1938) ("A tenant is one who holds or possesses lands or tenements by any kind of right or title, whether in fee, for life, for years, at will, or otherwise. [citations omitted] A lease is a conveyance of lands . . . for a term less than the party conveying has in the premises . . . Generally, a lease is something more than a mere conveyance of an estate—it is a contract for the possession and profits of lands or tenements for a certain period.").

▉ A tenant pays "rents" in consideration for his use and occupancy of real estate for the term of his lease—i.e., for his legal interest in that real estate. *State v. Bowman*, 202 Minn. at 46, 279 N.W. at 215; *Crowley v. Potts*, 180 Minn. 234, 240, 230 N.W. 645, 648 (1930). By negative inference if nothing else, then, a hotel guest does not pay "rent." Rather, the guest pays a room rate to the host in consideration for a license to enter and make temporary use of a portion of the host's real estate for a limited time, and for a limited purpose.

Room rates, thus, cannot be legally categorized as "rents." "Rents" within the contemplation of either of the assignments at bar could consist of the periodically-paid consideration for Plaintiff's commercial lease of a portion of its hotel facility to an independent business not directly owned or managed by Plaintiff, such as the ones discussed *supra* at p. 639.[7] They do not consist of the revenues generated from room rentals, or from the operation of such subsidiary businesses by the owner-operator itself.

▉ This conclusion is not fatal to Defendant's position, however. As a general matter, "profit" is defined as

> The benefit, advantage, or pecuniary gain accruing to the owner or occupant of land from its actual use; as in the familiar phrase "rents, issues and profits . . ."

BLACK'S LAW DICTIONARY at 1090 (5th ed. 1979). In turn, the phrase "issues and profits" is defined:

> As applied to real estate, [issues and profits] comprehend every available return therefrom, whether it arise above or below the surface.

BLACK'S LAW DICTIONARY at 747 (5th ed. 1979). Finally, "revenue" is defined as

> Return or yield, as of land; profit, as that which returns or comes back from an investment; the annual or periodical rents, profits, interest or issues of any species of property, real or personal . . .

BLACK'S LAW DICTIONARY at 1185 (5th ed. 1979).

These definitions support the conclusion that, as a matter of state law, the revenues which Plaintiff generates from collection of room rates in the course of its hotel operations are subject to Defendant's lien under either the mortgage or the collateral assignment, whether they be considered "issues," "issues and profits," "revenues," or "income" springing out of the underlying real estate. The only pronouncement under Minnesota legal authority—the tacit assumption voiced in *Cullen v. Minnesota Loan & Trust Co., supra* at n. 6—certainly does not compel or even support a contrary conclusion; while probably only dicta, and certainly not a focus of the ruling, it can be read as supporting the conclusion without distorting the structure of the decision.

Common sense, and a reasonable divination of the parties' own intentions, also support this conclusion. In taking its mortgage against Plaintiff's leasehold interest and against the underlying real estate itself, Defendant took certain property interests as its collateral. The mortgage against the underlying lands and Plaintiff's leasehold interest in the lands attached to real-property interests. *See Sanderson v. Engel*, 182 Minn. 256, 234 N.W. 450 (1931) (a mortgage is a pledge of real estate as security for a debt); *Republic Nat'l Life Ins. Co. v. Lorraine Realty Corp.*, 279

---

7. As the Court is well aware from experience in other Chapter 11 cases involving hotels, it is not uncommon for a hotel operator to contract with third parties to make such amenities available on the premises, where the owner-operator of the hotel does not care to assume the burden of such management and operation itself.

N.W.2d 349 (Minn.1979) (recognizing and enforcing real estate mortgage against lessee's interest under ground lease). The assignment in the mortgage itself was security for the underlying debt, cumulative to the security of the mortgage. The collateral assignment was ancillary to the original real property security,[8] and provided additional security for the same debt. *Cross Cos. v. Citizens Mortgage Investment Trust*, 305 Minn. 111, 118, 232 N.W.2d 114, 117 (1975).

These two security instruments were integrally related, and were executed in conjunction with one another. This circumstance, and the instruments themselves, clearly evidence the parties' intent to subject all of the economic fruits of Plaintiff's direct physical use of the real-property interests to a lien in favor of Defendant, to secure payment of the debt.[9] That physical use, of course, is the provision of rooms to guests. *Compare In re Flower City Nursing Home, Inc.*, 38 B.R. 642 (Bankr. W.D.N.Y.1984) (concluding that revenues of a nursing home were "rents and profits" subject to an assignment in favor of a creditor, on rationale that under New York state law "rents and profits are income generated from the occupation and use of the realty ...").

To the extent that the courts in *In re Kearney Hotel Partners* and *In re Ashkenazy Enterprises, Inc.* reached a contrary conclusion, this Court flatly disagrees. Those courts placed major emphasis on distinctions drawn in statutes which had nothing to do with the regulation of the specific relationship at hand; they also failed to consider the parties' actual intent, express or implied, as to the scope of the creditors' security. Further, to the extent that those decisions focused upon the alleged tenuousness of the connection between the mortgaged real estate and the revenues which the affected creditors claimed, they simply did not recognize the economic realities of the cases before them.[10]

■ The same conclusion does not prevail as to Plaintiff's revenues from restaurant and bar operations. This income is the fruit of the sale of tangible goods and the personal service involved in the preparation and presentation of those goods. To be sure, the sales take place on the real estate which is Defendant's security. The real estate itself, its ambience or decor, may enhance the value of the sales to some unquantifiable degree. The fact remains, however, that in generating these revenues Plaintiff is not temporarily assigning out little units from the property interests which constitute Defendant's security, as it is doing in generating its room rates. It is not primarily using the tangible security as the principal means of generating these revenues. They simply do not constitute the "issues and profits *of*" the real estate, or the "income, profits and issues ... *arising out of* or payable or collected *from* the real property" which are subject to Defendant's interests as assignee.

To sum up, then: Plaintiff's gross revenues from any aspect of its hotel operations do not constitute "rents" within the scope of assignments of rents. Its collected room rates do constitute "issues," "prof-

---

**8.** It is not necessary to address the question of whether Defendant's lien against the hotel structure attached to real or personal property interests. The fact that the leasehold and lands were real property is enough to evidence the parties' intent to transfer interests in realty to Defendant, which then allows the analysis to proceed.

**9.** Further evidence is the fact that the underlying debt was a non-recourse obligation by its terms. The parties structured the note to allow full enforcement of the debt against the real estate itself and against all income generated from it, but barred any enforcement of a deficiency against Plaintiff or its general partners. This strongly suggests a bargained-for exchange of remedies, with Defendant taking the right to all income from the use of the property, in exchange for its surrender of the right to enforce the personal liability of the debtor and the responsible third parties. It is difficult to imagine that Defendant would have waived its rights to pursue collateral sources of satisfaction, had it not gained an unchallengeable right to the fruits of the use of its tangible security.

**10.** At the risk of continuing the infliction of corny vocational aphorisms which was started in *In re Smith*, 68 B.R. 581 (Bankr.D.Minn. 1986), it must be said: a hotelier cannot host without a hotel.

its," "revenues," or "income," to which Defendant's interest under those assignments has attached.[11] Its revenues from restaurant and bar operations do not fall within any category of security under the assignments, and Defendant has no interest in them.

### B. Whether Defendant's Interest in Plaintiff's Revenues is Subject to Avoidance Pursuant to 11 U.S.C. § 544(a) as an Unperfected Security Interest.

▪ As its secondary argument, Plaintiff argues that its revenues, not cognizable as "rents" subject to assignment in favor of Defendant, constitute "accounts" within the meaning of MINN.STAT. § 336.9–106. This argument is mooted at least in part by the conclusion in the foregoing section, but the Court will treat it anyway. Apparently assuming for the sake of argument that Defendant has a

security interest in a class or classes of personal property which could include "accounts,"[12] Plaintiff maintains that Defendant has never filed a financing statement which would operate to perfect a security interest in "accounts." Thus, it argues, any such security interest which Defendant may hold in the revenues as "accounts" was unperfected as of the commencement of Plaintiff's Chapter 11 case, and is vulnerable to avoidance under 11 U.S.C. § 544(a).[13]

The latter part of this argument is unquestionably correct; there is no way that the wording of Defendant's filed financing statement can be construed to extend its notice of perfection to a security interest in intangibles such as accounts or collections of hotel revenues. MINN.STAT. § 336.9–302(1) requires the filing of a financing statement to perfect a security interest in an assignment of accounts.[14] The

---

**11.** The Court acknowledges that the Eighth Circuit reached the contrary conclusion in *United States v. PS Hotel Corp.*, 527 F.2d 500 (8th Cor. 1975) (per curiam), *aff'g* 404 F.Supp. 1188 (E.D. Mo.1975). *PS Hotel Corp.* was primarily a dispute over priority in claims to a hotel's collected accounts receivable from guests; it involved an assignment whose scope was limited to "any sublease, subletting or other use of any room or space." The decision is distinguishable on that fact alone; in any event, it was based on Missouri state law. The fact that several Bankruptcy Courts chose to rely on it in the decisions previously cited does not make it binding, precedential authority in any federal jurisdiction other than the two Districts of Missouri.

**12.** In its complaint, moving papers, and supporting documents, Plaintiff has never acknowledged that its authorized agent executed a security agreement granting such a security interest in favor of Defendant. It is thus unclear why Plaintiff structured its argument in this fashion; a more direct, on-point argument would have been that intangibles such as "accounts," rights to payment, or a stream of revenue simply did not fall within the class of tangible personal property which is plainly the subject of the filed financing statement in favor of Northwestern National, the later financing statements in favor of Defendant, and the security agreements which presumably corresponded to and underlay those financing statements.

**13.** The Bankruptcy Code gives a trustee the rights and powers of, and ... [the power to] avoid any transfer of property of the debtor

or any obligation incurred by the debtor that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or

(3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and ha perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

11 U.S.C. § 544(a). Essentially, this gives the trustee the power to avoid liens which are unperfected as of the commencement of the bankruptcy case. *Saline State Bank v. Mahloch*, 834 F.2d 690, 692 (1987); *In re Pirsig Farms, Inc.*, 46 B.R. 237, 240 (D.Minn.1985); *In re Mattick*, 45 B.R. 615, 617 (Bankr.D.Minn.1985). Plaintiff, as a debtor in possession under Chapter 11, has the rights and powers of a trustee. 11 U.S.C. § 1107(a).

**14.** If assignments in question are assignments of accounts, they are assignments of *all* of Plaintiff's accounts—and, hence, they do not fall within the exception of MINN.STAT. § 336.9–302(1)(e).

Minnesota Supreme Court has noted that the specificity requirements for description of the subject collateral in filed financing statements should be more exacting than those required of a security agreement under MINN.STAT. § 336.9–203(1)(a), to insure adequate notice to third parties of the scope of the creditor's liens. *James Talcott, Inc. v. Franklin Nat'l Bank of Mpls.*, 292 Minn. 277, 287 n. 3, 194 N.W.2d 775, 782 n. 3 (1972). As the court in *James Talcott, Inc.* noted, MINN.STAT. § 336.9–203(1)(a) requires a description in a security agreement to "reasonably identify" the subject collateral. 292 Minn. at 286–87, 194 N.W.2d at 781–82. *See also* MINN.STAT. § 336.9–110, and U.C.C. Comment thereto ("The test of sufficiency ... is that the description ... make possible the identification of the thing described."). The UCC–1 financing statement which Defendant filed could not be read as notice of a lien against "accounts," revenues, or any other form of income stream even under the more lenient specificity requirements for a security agreement; it made no mention of any sort of personalty other than tangible assets, and did not note "general intangibles," "contract rights," or "rights to payment" as among the classes of Defendant's security. It certainly did not meet the more exacting specificity requirement suggested by the dicta in *James Talcott, Inc. See In re Mattick*, 45 B.R. at 617–18 (security agreement and financing statement describing growing crops and proceeds thereof did not attach or perfect a security interest against general intangibles such as rights to payment under Department of Agriculture payment-in-kind program).

The former part of the argument, however, is fundamentally flawed. Plaintiff's rights under the two assignments are an interest in real estate. *See In re Greenha-*

*ven Village Apartments of Burnsville Phase II Limited Partnership*, 100 B.R. 465, 469–70 (Bankr.D.Minn.1989). They are not a personal property interest categorized as "accounts" within the ambit of Article 9 of the Uniform Commercial Code. Under the analysis in Section A of this discussion, this is the case regardless of the fact that the revenues were not derived from "leases" of the real estate.[15] As an interest in the real estate subject to Defendant's mortgage, Plaintiff's assignment of the "income, profits, and issues" from the real estate is specifically excepted from the filing requirements of Article 9. MINN. STAT. § 336.9–104(j); *In re Standard Conveyor Co.*, 773 F.2d 198, 203–04 (8th Cir.1985); *In re Greenhaven Village Apartments of Burnsville Phase II Limited Partnership*, 100 B.R. at 469–70.

Because the assignments in favor of Defendant were an interest in real estate, and because title to the subject real estate had been registered pursuant to Minnesota statute, the perfection of the assignments was complete upon registration of the underlying instruments pursuant to the Minnesota Torrens Act. *New York Life Ins. Co. v. Bremer Towers*, 714 F.Supp. 414 (D.Minn.1989); *In re Metro Square*, 106 B.R. 584 (D.Minn.1989), *rev'g* 93 B.R. 990 (Bankr.D.Minn.1988); *In re Greenhaven Village Apts. of Burnsville Phase II Limited Partnership*, *supra*; *In re Pavilion Place Assoc.*, 89 B.R. 36 (Bankr.D.Minn. 1988) (all holding that, under Minnesota law, assignment of rents is perfected upon filing in appropriate office of land records).

The assignments in favor of Defendant as to Plaintiff's revenues from room rates were fully perfected as of the commencement of this case. They are impervious to the avoidance remedies of 11 U.S.C. § 544(a). Simply stated, Plaintiff is not entitled to judgment as a matter of law, on

---

**15.** Thus, even though the debtor in *Greenhaven Village Apartments* was a residential landlord and thus generated "rents" in the traditional sense, that case is not distinguishable on either its facts or legal analysis. In *Greenhaven Village Apartments,* Judge Kressel relied on MINN. STAT. § 336.9–104(j) as the authority for his conclusion. The fact that MINN.STAT. § 336.9–104(j) specifically denominates an in-

terest in or lien on a lease or rents under a lease as an interest in real estate does not mean that other revenues undeniably and necessarily generated from the use or occupancy of real estate are not in the nature of real estate themselves, for collateral security purposes. They are, not the least because they have the same exclusive origin in the physical exploitation of the underlying real property collateral.

its prayer for avoidance of the lien interest which Defendant holds under the assignments.

### C. Whether Defendant May Be Granted Partial Summary Judgment, Given the Outcome of Plaintiff's Motion.

The summary judgment rule in bankruptcy adversary proceedings is BANKR.R. 7056, which incorporates FED.R.CIV.P. 56. Rule 56(c) provides that, upon a party's properly-supported motion for summary judgment,

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact *and* that the moving party is entitled to a judgment as a matter of law.

(emphasis added). The Court's analysis is a two-step, sequential one: first, to determine whether there are triable issues of fact which are material to the parties' claims and/or defenses; and, if not, to determine the moving party's legal entitlement to judgment. On the first step, the Supreme Court has noted:

As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Here, the governing law as discussed in Section A makes only the documentary facts material to the ultimate issue of the parties' entitlement to Plaintiff's revenues. Those facts are uncontested. While Defendant's counsel points to the prospect of factual dispute over certain points, under the rule of decision applicable here the outcome of this adversary proceeding would not turn on these points, or be affected by it in any way. The lack of triable fact issues makes this matter ripe for summary adjudication.

Even though there are no material facts in dispute, Plaintiff has not demonstrated that it is entitled as a matter of law to the full judgment which it has requested in this motion. Defendant, however, did not move for summary judgment in its own favor.[16]

---

**16.** This seems to be attributable to Defendant's counsel's election to analyze the central dispute in a fashion markedly different from the way either Plaintiff's counsel or the Court did. Counsel went to great lengths to attack Plaintiff's basic right to adjudication by a summary procedure, without challenging the accuracy or structure of Plaintiff's legal argument. For instance, Defendant insisted that there were triable fact issues as to the allocation of Plaintiff's room rate collections between payments for occupancy (which, it argued, would be subject to the assignments) and payments for services rendered in connection with the occupancy (which, it acknowledged, might not be subject to the assignments). It also argued that Plaintiff had failed to prove as a matter of fact that it had no long-term guests who could be considered as "tenants," revenues from whom would again be "rents" subject to the assignments. In both arguments, counsel adopted the paradigm structured by the cited caselaw from other jurisdictions, without question. However, Defendant adduced no evidence to counter Plaintiff's bald factual assertions that it received no revenues from occupants who could be considered to be "tenants" in a factual or legal sense. Had the Court adopted Plaintiff's view of the law, these ultimate facts would have been material. De-

fendant could not have resisted this motion by such a summary allegation of the existence of triable fact issues, without submitting some contradicting evidence. Plaintiff would have met its initial burden, under Rule 56(c), "by 'showing'—that is, pointing out to the ... Court—that there [was] an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Rule 56(e) then shifted the burden to Defendant, which had to come forward with evidence showing the existence of triable fact questions. *Id.* A movant for summary judgment does not have the burden to produce evidence which disproves its opponent's case. *Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552. The respondent to a summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts" after the movant has met its initial burden under Rule 56(c), as Plaintiff did here. *Matsushita Electric Indust. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The respondent must come forward with credible, probative evidence to contradict the movant's assertion that there are no triable fact issues. *In re Kostecky,* 111 B.R. 823, 827 (Bankr.D.Minn.1990); *In re Bowen,* 89 B.R. 800,

This puts this adversary proceeding into something of an anomalous posture. The Court can grant Plaintiff only part of the relief which it requests. The remaining issues are ripe for summary adjudication in favor of Defendant; however, Defendant has not given the Court the procedural vehicle which, technically, it must have to accord any relief to Defendant.

■■■ The lack of a motion, however, does not hamstring the process. The federal trial courts are empowered to grant summary judgment *sua sponte*, where the record commands this disposition and where no further purpose would be served by delaying the proceedings. *Celotex Corp v. Catrett*, 477 U.S. at 326, 106 S.Ct. at 2554. Of course, the courts should comply with the requirements of due process before making self-directed final dispositions by a summary procedure. However, so long as the losing party has had sufficient notice of the prospect of an adverse grant of summary judgment, and has had an opportunity to come forward with all of its evidence, due process is not violated by a disposition *sua sponte. Id.; Interco Inc. v. Nat'l Surety Corp.*, 900 F.2d 1264, 1268 (8th Cir.1990).

Here, Plaintiff based its motion for summary judgment upon its assertion that the

803 (Bankr.D.Minn.1988). Had the Court applied the rule of law which Plaintiff urged, Dfendant would have lost this motion; though it insisted it had the right to a trial on the fact question of whether any of the revenues were "rents," it did not carry its procedural burden to preserve that right. Luckily for Defendant, the Court saw the issue somewhat differently from the way both sides saw it, and applied legal authority which sprang from sources different from those which the parties cited. The Court fully acknowledges that this observation is made entirely in hindsight, and without criticism of Defendant's counsel. The sparse and unsettled state of the law on these issues made even the initial framing of issues unusually difficult, as is evidenced by the belabored length of this order.

17. The record does not permit an adjudication which reduces the parties' respective entitlements to specific dollars-and-cents amounts over particular times, or to an exact percentage-division of the gross revenues. The Parties did not request such an adjudication; at least the latter adjudication may not be possible, given the ebb and flow of the different aspects of the

material facts were uncontested and that the law entitled it to judgment. The Court has agreed that there is no triable fact issue which bears on Plaintiff's entitlement to the declaratory and equitable relief which it seeks. However, the law does not support full judgment in Plaintiff's favor; rather, it compels an outcome which splits the ultimate benefit of the adjudication between Plaintiff and Defendant.[17] Plaintiff itself properly argued that the issues were exclusively legal in nature. Therefore, it was fully and fairly on notice that an adverse disposition on any of those legal issues would not only result in a denial of judgment in its favor, but could result in a grant of full or partial judgment in Defendant's favor—regardless of the structure of Defendant's responsive arguments, and regardless of whether Defendant made its own motion for summary judgment.

A *sua sponte* grant of judgment partly in Defendant's favor will serve the goals of finality, certainty,[18] and judicial economy. Not coincidentally, it would be entirely in accordance with the terms and philosophy of the Federal Rules of Civil Procedure. *See In re O'Malley*, 90 B.R. 417, 422 (Bankr.D.Minn.1988).

THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED:

operation; and in any event it is not necessary. The cash-flow accountings which Plaintiff has submitted in other proceedings in its case will furnish an objective, quantifiable basis for the parties' own allocation in accordance with this order. If a formal order is necessary, or notice to creditors of a particular disposition of funds is required under the Bankruptcy Code and Rules, the Court can address the issue in a future judicial proceeding.

18. Plaintiff is in the final stages of formulating its plan of reorganization. Its counsel has acknowledged that the outcome of this adversary proceeding will affect the structure and terms of its proposed treatment of Defendant's claim in the plan. Plaintiff is already under certain fixed deadlines to dispose of its assets, under the terms of court-approved adequate protection arrangements with other secured creditors. Further delay to allow the making of a formal motion for summary judgment by Defendant would ill-serve all parties in interest to Plaintiff's case.

1. That Plaintiff's motion for full summary judgment in its favor is denied.

2. That Defendant's rights as assignee under "Granting Clause C" and "Granting Clause D" of a Mortgage and Security Agreement registered in the office of the Registrar of Titles for Hennepi County, Minnesota, on March 26, 1979, as Torrens Document No. 1322369, and under an Assignment of Rents registered in the office of the Registrar of Titles for Hennepin County, Minnesota, on March 26, 1979, as Torrens Document No. 1322370, were attached as of the commencement of Plaintiff's Chapter 11 case to revenues generated from the operation of the hotel on the real estate described in that assignment of rents, to the extent of all collections of room rates from guests of the hotel, and all other income generated by Plaintiff's occupancy and use of that real estate, other than revenues from food and beverage sales, and from sales of any other personalty.

3. That Defendant's rights as assignee described in Term 2 of this order were not attached as of the commencement of Plaintiff's Chapter 11 case to any revenue generated from sales of food and beverages in or from any restaurant, bar, or other facility on the hotel premises, or from sales of any other personalty.

4. That the interest of Defendant in Plaintiff's revenues which is described in Term 2 of this Order was properly perfected by its registration prior to the commencement of Plaintiff's Chapter 11 case and, hence, is not subject to avoidance under 11 U.S.C. § 544(a).

LET JUDGMENT BE ENTERED IN ACCORDANCE WITH TERMS 2 THROUGH 4 OF THIS ORDER.