**In the Matter of T–H NEW ORLEANS LIMITED PARTNERSHIP, Debtor.**

**Bankruptcy No. 91–10681.**

United States Bankruptcy Court, E.D. Louisiana.

March 23, 1992.

Rudy J. Cerone, New Orleans, La., for debtor.

## MEMORANDUM OPINION

THOMAS H. KINGSMILL, Jr., Bankruptcy Judge.

This matter came before the Court as a hearing on the motion of Financial Security Assurance, Inc. ("FSA") for segregation of hotel receipts, or alternatively, for adequate protection. The Debtor in this matter, T–H New Orleans Limited Partnership ("T–H New Orleans" or "the Debtor") opposes the motion. After considering the argument of counsel at the hearing, the evidence submitted, the memoranda submitted by the parties, and the applicable law, this Court enters the following Memorandum Opinion.

The Debtor filed a voluntary Chapter 11 petition in this Court on February 25, 1991, and since that date has operated as a debtor-in-possession. Prior to the filing, the Debtor and FSA executed various security instruments including a collateral real and collateral chattel mortgage and assignment of leases and rents ("collateral mortgage") and an assignment of accounts receivable. The effect of the filing of the bankruptcy petition on these security instruments is the basis of FSA's motion. FSA claims the hotel receipts of the debtor which have accrued post-petition are the "proceeds, product, offspring, rents, or profits" of property in which it has a pre-petition security interest; accordingly, under 11 U.S.C. § 552(b) its security interest extends to the hotel receipts acquired by the estate after the commencement of the case. The Debt-

or claims, however, that post-petition hotel revenues are not subject to pre-petition security interests, and therefore, 11 U.S.C. § 552(a) prevents FSA from claiming an interest in the revenues.

FSA has a security interest in the hotel. Its security interest includes a mortgage over the property, plant, fixtures, and equipment of the hotel and extends to "any right, title, interest or estate hereafter acquired by [the Debtor] in ... Land, Buildings, Leasehold Estate, Fixtures, Personalty, Leases and Rents and all cash and noncash proceeds of any and all thereof." Exhibit D at p. 6.

More specifically, under the terms of the collateral mortgage, the Debtor agreed to:

> "transfer, pledge, collaterally assign and deliver unto Mortgagee as security for the payment and performance of the Obligation, and grant a security interest in, all of the right, title and interest of Mortgagor in and to all of the following:
> (a) the leases;
> (b) the rents;
> (c) the fixtures; and
> (d) the personalty.[1]"

Exhibit D at p. 52.

The terms "leases" and "rents" are broadly defined as follows in the collateral mortgage:

> "*Leases:* Any and all leases, subleases, licenses, concessions or other agreements written or verbal, now or hereinafter in effect, including any ... license agreements which grant a possessory interest in and to, or the right, license or concession to use, all or any portion of the Mortgaged Property, and all other agreements ... which in any way relate to the use, occupancy, operation, maintenance, enjoyment or ownership of all or any portion of such Mortgaged Property ... together with all cash or noncash proceeds of all or any thereof...."
>
> "*Rents:* All of the rents, revenues, income, proceeds, profits, security and other types of deposits, and other benefits paid or payable and to become due or

---

1. Personalty, as defined in the collateral mort-     gage, includes accounts receivable.

payable to Mortgagor by parties to any Leases for using, leasing, licensing, possessing, operating from, residing in, selling or otherwise enjoying any portion or portions of the Mortgaged Property, together with all cash and non cash proceeds of any or all thereof."

Exhibit D at pgs. 15, 18.

Moreover, the accounts receivable are also subject to a separate assignment of accounts receivable. Exhibit G.

Sections 552(a) and (b) of the Bankruptcy Code, concerning the postpetition effect of security interests, govern the determination of whether these prepetition security agreements encompass hotel receipts generated by the Debtor after the filing of its petition for relief. Section 552(a) provides as follows:

> "Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case."

Section 552(b) states in pertinent part:

> "... [I]f the debtor and a secured party enter into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable non-bankruptcy law, except to the extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise."

The inquiry this Court must make for purposes of this opinion is three-fold. First, this Court must determine if the security interest created by the security agreement extends to property of the Debtor acquired before the commencement of the case. If so, then this Court must also determine if the security interest also extends to the proceeds, product, offspring, rents or profits of such property. If this inquiry is answered affirmatively, the third issue to decide is whether or not the hotel receipts fall within the categories of proceeds, product, offspring, rents, or profits delineated in the security agreement. This third issue is governed by state law. *In re Mid–City Hotel Associates*, 114 B.R. 634, 639 (Bankr. D.Minn.1990) *citing Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979).

Initially, this Court finds that the collateral mortgage extends to the property of the Debtor, the hotel, which was acquired before the commencement of the case. Furthermore, the assignment of rents in the body of the collateral mortgage gives FSA the general right to the "rents, revenues, income, proceeds, profits, security, and other types of deposits, paid or payable" to the Debtor by parties to any leases pertaining to the mortgaged property. The term "lease" is broadly defined to include "all other agreements ... which in any way relate to the use ... [or] ... occupancy of any portion of the mortgaged premises and all cash or noncash proceeds of any or all thereof."[2] Accordingly, the second inquiry is satisfied, as the security interest extends to the proceeds, product, offspring, rents, or profits of the secured property. This Court must therefore look to state law to determine if the hotel receipts fall within the classes of proceeds, product, offspring, rents or profits of the hotel. These classes are specifically referred to in the security documents as the "rents, revenues, income, proceeds, profits, security, and other types of deposits, paid or payable". Consequently, the relevant inquiry is whether, under state law, hotel receipts are "rents, revenues, income, proceeds, profits, security" or "other types of deposits, paid or payable" from leases of the secured property.

---

**2.** After reading the definition of "leases" carefully, this Court finds that this phrase does not limit FSA to recovery of rents from leasehold tenants of the Debtor. *See In re Mid–City Hotel Associates,* 114 B.R. at 639.

This Court has found, and counsel has pointed out, only one such Louisiana case dealing with the classification of hotel receipts. In *Pioneer Bank and Trust Company v. Oechsner*, 468 So.2d 1164 (La. 1985), the court examined the issue of whether or not the revenues which the plaintiff attempted to seize under a writ of sequestration were "rents or revenues" produced by the property, a hotel. Under Louisiana Code of Civil Procedure Articles 327, the seizure of the property by the sheriff effects the seizure of the fruits and issues the property produces, and therefore, the sheriff shall collect all "rents and revenues" produced by the property. The court noted the difference between the legal relationship of an innkeeper and his guest and that of a landlord and tenant, finding that the principal distinction was "that the tenant acquires an interest in the real estate and has the exclusive possession of the lease premises, while the lodger acquires no estate and has merely the use without the actual or exclusive possession." *Id.* at 1168 *citing Walling v. Peavy-Wilson Lumber Co.*, 49 F.Supp. 846 (W.D.La. 1943) and *Coggins v. Gregorio*, 97 F.2d 948 (10th Cir.1938). The court therefore concluded that the revenues at issue were not "rent ... produced by [the property]. *Id.* The court went on to find, however, that hotel receipts were "revenues" therefrom", noting that the revenues paid by its guests are, like rent, paid for the use of the property. In that sense, they, like rent, are produced by the property.[3]

This Court has also considered the particular issue at bar, although cursory, in its opinion of March 6, 1990, in *In the Matter of Thomas Jefferson Construction, Pelican Homestead and Savings Association v. Thomas Jefferson Construction Corporation and Progressive Bank and Trust*, Bankruptcy No. 86–03431, Adversary No. 88–0306. One of the issues sought to be decided by the plaintiff in its complaint was the determination of ownership of rents and revenues produced by the hotel owned by Debtor. After examining *Pioneer Bank*, this Court noted that *Pioneer Bank* lent support to its finding that proceeds generated from daily room rentals of a lodging facility constituted "revenues" under the plaintiff's security documents.[4] *Id.* at 29.

◼ Under the doctrine of *Butner v. United States*, this Court is bound by Louisiana law on the issue of issue of whether hotel receipts fall within the classifications of security listed in the security agreements. Under the law of this state, as expounded in *Pioneer Bank*, hotel receipts are classified as "revenues". The assignment of rents in the collateral mortgage extends to "revenues" of any leases of the property. "Leases" are defined to include the "use" or "occupancy" of property. Accordingly, as revenues from the use or occupancy of the mortgaged property, the hotel receipts at issue are subject to FSA's security interest. This conclusion is consistent with other bankruptcy courts' treatment of this issue based upon state law. *See In re Mid–City Hotel Associates*, 114 B.R. at 641–42.[5]

◼ Finally, the issue of FSA's perfection of its post-petition security interest in the revenues must be addressed. Upon the Debtor's filing of its petition in bankruptcy on February 25, 1991, the automatic stay prevented any act by FSA to "create, perfect, or enforce any lien against property of the estate." 11 U.S.C. § 362(a)(4). Further, 11 U.S.C. § 544(a) allows T–H New Orleans, as Debtor in Possession, to as-

---

3. The court also pointed out that the mortgage at issue in the case expressly covered all property, movable and immovable, "used in connection with the operation of the ... property."

4. This Court points out that in its opinion in *Thomas Jefferson Construction* the classification of the hotel receipts was not a primary issue as in the case at bar. Moreover the pertinent clause in the collateral mortgage referred to a pledge of "all of the rents and revenues".

Therefore, the distinction between "rents" and "revenues" pointed out by the Supreme Court in *Pioneer Bank* did not affect the outcome of the *Thomas Jefferson Construction* matter.

5. As this Court finds that the hotel receipts fall within the assignment of revenues, this Court will not address whether the hotel receipts could also fall within the assignment of accounts receivable.

sume the status of a lien creditor or bona fide purchaser and to avoid an assignment of revenues that was not perfected at the time of the filing of the bankruptcy petition. *In re C.G. Chartier Construction, Inc.*, 126 B.R. 956, 958 (E.D.La.1991) *citing In re Casbeer*, 793 F.2d 1436, 1443 (5th Cir.1986); 11 U.S.C. § 1107).

Under 362(b)(3), however, the filing of a petition in bankruptcy does not operate as a stay of any act to perfect an interest in property to the extent that the trustee's avoidance powers are subject to 11 U.S.C. § 546(b). This section states:

> "the rights and powers of a trustee under sections 544, 545, and 549 of this title are subject to any generally applicable law that permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of such perfection. If such law requires seizure of such property or the commencement of an action to accomplish such perfection, and such property has not been seized or such action has not been commenced before the date of such filing of the petition, such interest in such property shall be perfected by notice within the time fixed by such law for such seizure or commencement.

11 U.S.C. § 546(b).

Accordingly, in order for FSA to escape having its interest in the revenues voided under Section 544(a), Louisiana law must "permit a creditor to enforce a security interest in revenues against an entity [in this case T–H New Orleans as Debtor in Possession] that acquired rights to the revenues before the creditor perfected." *In re Chartier Construction*, 126 B.R. at 959.

Louisiana law permits contractual provisions to alter or modify the priority of liens. *T.D. Bickham Corp. v. Hebert*, 432 So.2d 228, 231 (La.1983). Here, the Debtor has also agreed not to alienate and encumber FSA's collateral and, therefore, the parties have agreed in their contracts to alter the order of lien priorities. The Loan Agreement provides, "The Borrower shall not encumber, pledge, mortgage, convey, sell, transfer or assign (as security or oth-

erwise) any or all of its estate and interest in and to the Hotel". Exhibit A at § 4.21. "Hotel" is defined to mean, "the Hotel Property, together with the improvements, personal property, easements, rights and other property described as the 'Mortgaged Property' in the Mortgage relating to the Hotel Property being hereinafter referred to as a 'Hotel' ..." Exhibit A at § 2.1(f)(2). The "Mortgage" is defined in the Loan Agreement to mean the Collateral Mortgage. *Id.* "Mortgaged Property" is defined in the Collateral Mortgage to include:

> (iv) any and all other security and collateral of any nature whatsoever, now or hereafter given by Mortgagor to secure the payment and performance of the Obligation (as defined herein);
>
> (vi) any right, title, interest or estate hereafter acquired by Mortgagor in any of the foregoing and in and to the Land, Buildings, Leasehold Estate, Fixtures, Personalty, Leases and Rents; and
>
> (vii) all cash and noncash proceeds of any and all thereof.

Exhibit D at p. 6. As evidenced by the above language, the parties agreed to alter the order of lien priorities and this agreement extended to all of the collateral. Thus, this Court finds that Louisiana law permits FSA to enforce its security interest in the revenues against T–H New Orleans, who as debtor in possession, acquired rights in the revenues prior to FSA's perfection.

Furthermore, this Court finds that FSA's 546(b) notice given on March 19, 1991, provided sufficient notice under § 546(b) to allow FSA to perfect its interests in the revenues post petition, effective on the date the notice was filed. *In re Chartier Construction*, 126 B.R. at 959. Thus, this Court finds that FSA perfected its security interest in the revenues on March 19, 1991, when it filed its § 546(b) notice. The filing of this notice gave the earliest notice to segregate the revenues precluding the Debtor's further use of such funds. Therefore, from the time of the Debtor's default until March 19, 1991, the revenues collected by the Debtor were not subject to FSA's

privilege. Accordingly, FSA's motion to segregate hotel receipts from the date of March 19, 1991 forward is Granted. Counsel are to confer and subsequently submit to this Court an appropriate adequate protection order concerning FSA's cash collateral. An appropriate Order will be entered.