**GREAT–WEST LIFE & ANNUITY ASSURANCE COMPANY, Appellant,**

v.

**PARKE IMPERIAL CANTON, LTD., Appellee.**

No. 5:93 CV 2184.

Bankruptcy No. 93–61004.

United States District Court, N.D. Ohio, Eastern Division.

Sept. 23, 1994.

Jack R. Pigman, Porter, Wright, Morris & Arthur, Columbus, OH, for appellant.

Russ H. Kendig, Krugliak, Wilkins, Griffiths & Dougherty, Canton, OH, Howard E. Mentzer, Georgene B. Powell, Camille Karin Dakdduk, Mentzer, Vuillemin & Robinson, Akron, OH, for appellee.

*MEMORANDUM OPINION*

DOWD, District Judge.

## I. INTRODUCTION

Appellant, the Great–West Life & Annuity Assurance Company ("Great–West"), pursuant to 28 U.S.C. § 158(a) and Bankruptcy Rule 8001(b), appeals from the September 1, 1993 Memorandum of Decision and Order of Northern District of Ohio, Chief Bankruptcy Judge, James H. Williams. Appellee, Chapter 11 debtor in possession, Parke Imperial Canton, Ltd. a.k.a. Parke Hotel Canton ("Parke Imperial") has filed its brief in opposition. On September 20, 1994 the Court heard oral argument.

## II. DECISION OF THE COURT BELOW

In its September 1, 1993 Memorandum of Decision and Order, the Bankruptcy Court held (1) that Great–West had no security interest in the postpetition hotel room revenues and other operating revenues of Parke Imperial because those revenues did not constitute proceeds, rents or profits under 11 U.S.C. § 552(b); (2) that the Motion of Appellee Parke Imperial for Authority to Use Cash Collateral be denied as moot; and (3) that the Court's July 6, 1993 Order, which had been submitted pursuant to a stipulation between Great–West and Park Imperial by way of an Agreement for Use of Cash Collateral on a Limited Basis (the "Agreed Order"), be vacated.

During the course of the bankruptcy proceedings below, Great–West hoped to secure its alleged priority position to Parke Imperial's cash collateral vis a vis the United States Trustee and other secured creditors by obtaining court approval of an Agreed Order between itself and Parke–Imperial. The Trustee and the other creditors—including SouthTrust Bank, FSB ("SouthTrust") and Imperial House Motel of Canton, Ltd. ("Imperial Motel")—objected. Based on these objections, the Bankruptcy Court reversed its preliminary approval of the Agreed Order and denied Great–West's claim that Park Imperial's cash collateral constituted proceeds, rents or profits of real estate in which

Great–West could hold a valid security interest pursuant to 11 U.S.C. § 552(b).

The Bankruptcy Court found that because Great–West could not maintain any security interest in Parke Imperial's postpetition hotel room receipts and operating revenues under 11 U.S.C. § 552(b), Parke Imperial would have no need of "adequate protection" pursuant to 11 U.S.C. § 363 from security interests which were unenforceable. By not recognizing any security interest held by Great–West in Parke Imperial's cash collateral, the Bankruptcy Court described the motion to use that collateral as "unnecessary." The instant appeal challenges the refusal of the Bankruptcy Court to accredit Great–West's asserted security interest.

For the reasons set forth below, the September 1, 1993 Memorandum of Decision and Order of the Bankruptcy Court is affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion. In sum, the Court holds that the question of whether section 552(b) of the Bankruptcy Code encompasses security interests in hotel room and banquet room revenue is a question decided by the interpretation of unique federal statutory law. A plain-language interpretation of section 552(b) indicates that the "profits" exception for the postpetition continuation of prepetition security interests is broad enough to include hotel room and banquet room revenues. Nevertheless, section 552(b) has the additional prerequisite that a creditor comply with the requirements of "applicable nonbankruptcy" law before its provisions will apply. Significantly, Ohio law governs the creation and perfection of security interests that otherwise would be eligible to section 552(b) protection. In this case, even if one assumed for purposes of review that Great–West and Park Imperial created a security interest in banquet room and hotel room revenue under Ohio law, Ohio law still requires such interests to be perfected in accordance with Article 9 of Ohio's UCC, Ohio Rev.Code §§ 1309.01 to 1309.50. Without having a decision from the Bankruptcy Court as to whether or not Great West properly complied with Article 9 of Ohio's UCC in attempting to perfect its asserted security interest, the case will be remanded for a

determination of Great–West's compliance with Ohio law and, if necessary, for a determination of the applicability of the equitable exception outlined by 11 U.S.C. § 552(b).

## III. BACKGROUND FACTS

On February 26, 1974, Imperial House Motel of Canton, Ltd. ("Imperial Motel") executed and delivered to Citizens Mortgage Corporation ("Citizens"), a mortgage note (the "Note") in the principal sum of $2,500,000. As security for repayment of the Note, Imperial Motel executed and delivered to Citizens a mortgage (the "Mortgage") on the hotel property at issue. On the same day, Citizens assigned the Note and the Mortgage to Appellant Great–West Life & Annuity Assurance Company ("Great–West") with an endorsement upon the original instruments. The Mortgage was recorded on February 28, 1974, in Volume 3769, Page 925 of the Official Records of Stark County Ohio.

The Mortgage provided that Imperial Motel, as Mortgagor, in consideration of the $2,500,000, did,

hereby grant, bargain, sell, convey and warrant unto Mortgagee, its successors and assigns, the premises [of the hotel] ...
TOGETHER with all ... the fixtures appurtenant thereto ..., and all property now or hereafter attached to or reasonably necessary to the use of the premises, all of which shall be deemed to be fixtures and shall be a part of the security for the indebtedness herein mentioned and shall be covered by this mortgage; and together with all ... the buildings, improvements, ... rights, liberties, privileges, tenements, hereditaments and appurtenances thereunto appertaining, and the reversions and remainders, rents, issues and profits thereof.

(Mortgage at 1–2).

Imperial Motel also promised that the Mortgagee shall have the right, at all times while such default exists, forthwith to enter into and upon the premises hereinbefore conveyed and take possession thereof or to appoint an agent or trustee for collection of the rents, issues and profits thereof: the net income, after allowing a reasonable

fee for the collection thereof and management of the property, may be applied toward payment of ... charges against the property, or in reduction of the debt or other sums hereby secured, in such manner and proportion as Mortgagee may elect and the rents, issues and profits of all and every part of the premises are hereby specifically pledged to the payment of the debt hereby secured and of all other obligations which may accrue under the terms of this mortgage.

(Mortgage ¶ 9 at 4–5).

In addition, the Mortgage allowed the Mortgagee to appoint a receiver "to protect the lien of this mortgage against the premises or its rents, issues and profits ..." and "to collect the rents, issues and profits of the premises, and, after payment of the expenses of the receivership and management of the property, to apply the same toward ... charges against the property and in reduction of the debt or other sums hereby secured...." (Mortgage ¶ 10 at 5).

On February 26, 1974, Imperial Motel also executed and delivered to Great–West an "Assignment of Rents" which was recorded on March 8, 1974 in Volume 181, page 971 of the Official Records of Stark County Ohio. In that instrument, Imperial Motel did "assign, transfer and set over unto Assignee [Great–West], its successors and assigns, the possession of the mortgaged property above referred to and all the rents, issues and profits now due or to become due and derived from such property ...," subject to several conditions. (Assgn. of Rents at 1). The conditions provided, in part, that in the event of default for a period of thirty (30) days, Imperial Motel would assign all leases of the premises to Great–West. As well, the conditions specified that the "net income" from "[a]ll sums collected and received by Assignee [Great–West] out of the rents, issues and profits of such property" be applied to a reduction of the mortgage debt and accrued interest, but no credit would be given "for any uncollected rents or other uncollected accounts or bills, ... [or] for any rents, issues and profits derived from the property after the Assignee [Great–West] shall obtain possession of the premises under

order of court or by operation of law." Another condition provided that as long as Imperial Motel did not default on its indebtedness or promises it would "have the right to the possession of said property and to collect upon, but not prior to accrual, all rents, issues and profits from said mortgaged property and to retain, use and enjoy the same." (Assgn. of Rents ¶¶ 1, 2 & 5).

On the same day as its execution of the Mortgage and Assignments of Rents (February 26, 1974), Imperial Motel executed a Security Agreement in Great–West's favor which covered personal property or fixtures attached to the mortgaged property.

Almost ten years later, on November 18, 1983, Imperial Motel deeded all of the mortgaged property to Appellee Parke Imperial Canton, Ltd. a.k.a. Parke Hotel Canton ("Parke Imperial"). Parke Imperial assumed the outstanding indebtedness and obligations of Imperial Motel under the 1974 Note and Mortgage through an assumption agreement with Great–West. That same day the Note and Mortgage were modified to reflect the change in ownership, and were later recorded with the Recorder's Office in Stark County Ohio.

On May 5, 1992 Great–West filed a financing statement with the Ohio Secretary of State signed by Superior Standard Management of Columbus Ohio, apparently as general partner for Appellee Parke Imperial. Incorporated into that financing statement were provisions covering the fixtures of the mortgaged property and "any or all of Debtor's accounts arising from all the rents and revenues of the Real Estate, including those now due, past due, or to become due by virtue of any lease or other agreement for the occupancy or use of all or any part of the Real Estate."

Two weeks later, on May 19, 1992, Parke Imperial filed its Chapter 11 bankruptcy petition pursuant to 11 U.S.C. § 301. On June 1, 1993 Great–West filed a notice of perfected security interests under 11 U.S.C. § 546(b). At the time of filing, Parke Imperial owed Great–West $1,941,753.77, plus interest from November 9, 1992, to February 23, 1993, of $66,445.20, plus interest from February 24, 1993, of $638.38 per diem. The parties at-

tribute approximately 39% of Park Imperial's receipts to hotel room revenue, and the remaining 61% of operating revenue to food sales (46.1%), beverage sales (11.8%), banquet room rentals, telephone revenue, house gratuities and game revenue (3.5%).

## IV. POSTPETITION COLLATERAL UNDER THE BANKRUPTCY CODE

■ Absent a contrary federal statute, the acquisition and maintenance of security interests in a bankruptcy debtor's estate are determined by state law, in this case Ohio. *See Butner v. United States*, 440 U.S. 48, 55–56, 99 S.Ct. 914, 918–19, 59 L.Ed.2d 136 (1979). Despite state law, however, the Bankruptcy Code exempts the postpetition property of the debtor from "any lien resulting from any security agreement entered into by the debtor before the commencement of the case," 11 U.S.C. § 552(a), except in certain circumstances as outlined in 11 U.S.C. § 552(b). Section 552(b) provides,

if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law....

Section 552(b) of the Bankruptcy Code presents several questions: (1) whether Great–West and Parke Imperial entered into a prepetition "security agreement" that extended to "proceeds, product, offspring, rents, or profits" of Parke Imperial's prepetition property; and (2) whether nonbankruptcy law, in light of the security agreement entered into by Great–West and Parke Imperial, preserved Great–West's security interest in that property. *Cf. In re Lease–Sea, Inc.*, 140 B.R. 185, 187 (Bankr.N.D.Ohio 1992). Failure by Great–West to establish its entitlement to either of these section

552(b) requirements, will bar its claim of a priority position to the postpetition hotel room receipts or other operating revenue of Parke Imperial.

### A. Federal Interpretation of the Bankruptcy Code.

The Bankruptcy Code defines "security agreement" to mean an "agreement that creates or provides for a security interest;" and "security interest" to mean a "lien created by an agreement." 11 U.S.C. §§ 101(50) & 101(51). The Code defines a "lien" as a "charge against or interest in property to secure payment of a debt or performance of an obligation." 11 U.S.C. § 101(37). The Revision Notes and Legislative Reports of the 1978 Bankruptcy Code make clear that the definition of "lien" is "very broad;" and a "security interest" as defined by federal law is broader than the same terms used in the Uniform Commercial Code, article IX ("UCC, Article 9") and includes such interests as those created by real property mortgages. "Historical & Statutory Notes," 11 U.S.C.A. § 101 at 33–34 (1993).[1] Significantly, however, section 101 of the Bankruptcy Code provides no uniform definition of the terms "proceeds, product, offspring, rents or profits" as used in section 552(b).[2]

■ The Bankruptcy Court below reasoned that Ohio law should be used to determine the meaning of "proceeds, product, offspring, rents or profits" under section 552(b). Mem. of Decision at 9–10. This Court disagrees. Although the uniform definitions of terms under state laws dealing with commercial transactions or real property interests may be persuasive as to the meaning of certain terms under section 552(b) of the Bankruptcy Code, those definitions are not determinative. "Proceeds, rents or profits" as governing terms of art included in a federal statute acquire unique meanings under federal law, which may be the same or different from that enacted by state governments. Although Congress drafted the Bankruptcy Code with the provisions of the UCC in mind, local variations from that uniform standard would not appear relevant.

As the Supreme Court held in *Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 917, 59 L.Ed.2d 136 (1979), Congressional authority "would clearly encompass a federal statute defining [a property holder's] interest in the rents and profits earned by property in a bankrupt estate." This Court concludes that 11 U.S.C. § 552 is just such a statute in the postpetition collateral context. If not for section 552, state law would govern postpetition security interests in collateral. Properly interpreted, the "state law rule" of *Butner* shows that, at most, local law serves as persuasive authority for whether section 552 operates to extinguish a creditor's claims to a continued security interest following commencement of a bankruptcy case. *Cf. In re Pigeon*, 49 B.R. 657, 659 (Bankr.D.N.D.1985) ("[I]f application of a term in an ambiguous [federal] statute can only be made upon reference to collateral sources, it is most appropriate to examine legislative history and not definitions contained in state statutes.") (interpreting 11 U.S.C. § 552(b)).

### B. The Security Agreements.

Lest the analysis be distracted, the first issue to be addressed, as framed by section 552, is whether Great–West and Parke Imperial entered into a prepetition "security agreement" that extended to "proceeds, product, offspring, rents, or profits" of Parke Imperial's prepetition property. 11 U.S.C. § 552(b). An examination of the 1974, 1983

---

**1.** Although the existence of a "security interest" for Code purposes hinges on the broad definition of "lien" in section 101(37), the Revision Notes of the 1978 Code also state that "[w]hether a consignment or a lease constitutes a security interest under the bankruptcy code will depend on whether it constitutes a security interest under applicable State or local law." 11 U.S.C.A. § 101 at 34 (1993). The Court is unaware how a security interest under the Code could at one moment depend on whether it is a "interest in property to secure payment of a debt" that is

"created by agreement," but in certain other cases be dependant on "local law." Unless local law were to define a consignment or a lease as not creating a "property interest" at all, it would seem that local law should have no significant bearing on the meaning of terms used in a federal statute.

**2.** As outlined below, legislative commentary has defined "proceeds" to be broader than that covered by the UCC.

and 1992 documents at issue, in light of the expansive definitions of the Code provided in section 101, shows clearly that Great–West had a "security agreement" with Parke Imperial that extended to "rents, issues and profits" of the mortgaged hotel property. The record does not show, however, that Great–West had a security agreement that specifically mentioned hotel room rental, banquet room rental, food and beverage sales, telephone revenue, house gratuities or game revenue.

The proposition that the Bankruptcy Court found dispositive, however, was not the interpretation of the security agreements themselves (*see* discussion of the parties' intent under nonbankruptcy law *infra*); but that regardless of the nature of the parties' security agreement or the perfection of that agreement, any security interest in hotel room receipts or operating revenue could not survive Parke–Imperial's Chapter 11 filing because section 552(b) "excludes" hotel room receipts and operating revenue from its definition of "proceeds, rents or profits." Although courts may blur the separate bankruptcy and nonbankruptcy inquires mandated by section 552(b), it is essentially this definitional "exclusion," which when read into the Bankruptcy Code, that so divides the Courts.

## V. PROCEEDS, RENTS OR PROFITS OF PREPETITION COLLATERAL UNDER 11 U.S.C. § 552(b)

Courts differ on the proper interpretation of the postpetition collateral exception of section 552(b) of the Bankruptcy Code. *See generally* 4 *Collier on Bankruptcy* ¶ 552.02 at 552–6 (15th ed. 1990) (distinctions not "clear cut"). Of the many cases which deal with postpetition security interests in hotel room revenue and/or operating revenue, only a few address the crucial threshold issue presented by section 552(b) and none adequately recognize the unique question of federal law that it presents. These courts, as stated by the court below, seem to be "unanimous ... that the issue is controlled by state law and most cite to *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)." Mem. of Decision at 6. *Butner*, a case decided under the old Bankruptcy Act,

made no such ruling, however. As outlined above, *Butner* held that Congress had the "power" to enact bankruptcy law that allowed for a uniform treatment of state-created security interests, but had not yet exercised that power. 440 U.S. at 54, 99 S.Ct. at 917. With the enactment of section 552(b), Congress has spoken. The interpretation of that enactment is purely a question of uniform federal law.

### A. The Prepetition Collateral Requirements and Postpetition Operating Revenue.

Section 552(a) of the Bankruptcy Code extinguishes prepetition security interests in after-acquired property unless permitted by section 552(b). Great–West contends that section 552(b) would permit a continuation of a properly perfected security interest in Park Imperial's hotel room rental, banquet room rental, food and beverage sales, telephone revenue, house gratuities and game revenue. Park Imperial contends that section 552(a) extinguishes any security interest in this type of revenue as after-acquired property.

The language of section 552(b) makes clear that there must be a security interest in the debtor's property acquired prior to the commencement of the bankruptcy case before an inquiry can be made as to whether a security interest in the "proceeds, product, offspring, rents, or profits of such property" would survive postpetition. If there is no security interest in "such property" before the commencement of the bankruptcy case, then it is irrelevant whether there might be a security interest in "proceeds, product, offspring, rents, or profits" of property to be acquired after the commencement of the case. Section 552(b) "creates an exception for proceeds, rents and the like generated by prepetition collateral, and not property acquired by the debtor or the estate postpetition." *Collier on Bankruptcy, supra,* ¶ 552.02 at 552–5 to 552–6 (citation omitted).

■ Here, Great–West contends that its 1974 Mortgage and Assignment of Rents which extends to "all the rents, issues and profits now due or to become due and derived from ..." the mortgaged hotel property covers the postpetition operating revenue of Park Imperial. First, Great–West fails to

direct this Court's attention to any prepetition security agreement which covers Park Imperial's food or beverages. That Park Imperial may have sold food or beverages postpetition is irrelevant to the section 552(b) inquiry if Park Imperial's food or beverages were never collateralized prepetition. Second, telephones and games are personal property, not even fixtures, and Great–West fails to show how any of its agreements with Park Imperial created a prepetition lien on telephones or games much less that such a lien extended to the revenue derived therefrom. Third, house gratuities are simply after-acquired property and there is no evidence to show a security agreement which covered that. There is no basis to support Great–West's claim to a security interest in Park Imperial's food and beverage sales, telephone revenue, house gratuities and game revenue. What remains of Great–West's asserted security interest in Parke Imperial's postpetition operating revenue is its asserted security interest in the revenue from Park Imperial's banquet room and hotel room rentals.

Unquestionably, Park Imperial's banquet rooms and hotel rooms are part of the real estate covered by the 1974 Mortgage and Assignment of Rents and the 1983 Assumption Agreement. Whether revenue garnered by the letting of those spaces may qualify as "proceeds, product, offspring, rents, or profits" under 11 U.S.C. § 552(b) is the central issue on appeal. Of the five types of property subject to the section 552(b) exception, Great–West contends that its interest in the hotel room revenue and banquet room rental could qualify as "proceeds, rents or profits" of prepetition secured property. The Court will first discuss whether this revenue could constitute "proceeds" of the mortgaged property and then discuss whether it could constitute "rents" or "profits."

*B.* *"Proceeds" of Mortgaged Hotel Estate.*

■ The interpretation of a federal statute is a matter of federal law and "proceeds"

has unique meaning under that law. The legislative history to section 552 indicates that "[t]he term 'proceeds' is not limited to the technical definition of that term in the UCC, but covers any property into which property is converted." *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 376–77 (1977), 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6333. Although broader than the definition in UCC § 9–306(1),[3] the federal approach still maintains "conversion" as the essential aspect of "proceeds." *Cf. In re S & J Holding Corp.*, 42 B.R. 249, 250 (Bankr.S.D.Fla. 1984) (Cash generated from video games is "not received from the sale of the collateral, but rather, through the use of it;" and the mere "use of the collateral does not make it 'proceeds'...."). Certainly there has been no sale, exchange, collection, disposition, or conversion of the mortgaged hotel real estate in this case. Although one might debate whether the Bankruptcy Code's definition of proceeds differs from the UCC definition in other contexts, it is clear that the essential aspect of "transmutation" of the mortgaged hotel real estate has not occurred. *See Collier on Bankruptcy, supra,* ¶ 552.02 at 552–7 (All the tests defining proceeds attempt to pinpoint the prepetition acquisition of the collateral and its postpetition "transmutation"). Park Imperial's postpetition hotel and banquet room revenues do not constitute "proceeds" of the mortgaged hotel real estate under 11 U.S.C. § 552(b).

*C.* *"Rents" of Mortgaged Hotel Real Estate.*

■ The meaning of section 552(b) is a matter of statutory interpretation and congressional intent. In particular, "the plain language of the Bankruptcy Code and [nonbankruptcy law] is our determinant." *Patterson v. Shumate,* 504 U.S. 753, ——, 112 S.Ct. 2242, 2246, 119 L.Ed.2d 519 (1992) (citing *Toibb v. Radloff,* 501 U.S. 157, 160, 111 S.Ct. 2197, 2199, 115 L.Ed.2d 145 (1991)). The opinion of the court in *In re Mid–City*

---

**3.** " 'Proceeds' includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds. Insurance payable by reason of loss or damage to the collateral is proceeds, except to the extent that it is payable to a person other than a party to the security agreement. Money, checks, deposit accounts, and the like are 'cash proceeds'. All other proceeds are 'non-cash proceeds'." UCC § 9–306(1).

*Hotel Assoc.,* 114 B.R. 634 (Bankr.D.Minn. 1990) provides a useful starting point for the proper interpretation of section 552(b) property. The *Mid–City Hotel* court recognized that whether hotel room revenue qualified as "rents" or "profits" of the underlying real estate would be the crucial issue. 114 B.R. at 638. Although *Mid–City Hotel* skipped the federal law question and engaged in an analysis under relevant nonbankruptcy law, it found the following plain language definitions instructive:

> As a general matter, "profit" is defined as The benefit, advantage, or pecuniary gain accruing to the owner or occupant of land from its actual use; as in the familiar phrase "rents, issues and profits . . ."
>
> *Black's Law Dictionary* at 1090 (5th ed. 1979). In turn, the phrase "issues and profits" is defined:
>
> As applied to real estate, [issues and profits] comprehend every available return therefrom, whether it arise above or below the surface.
>
> *Black's Law Dictionary* at 1185 (5th ed. 1979).

*Mid–City Hotel,* 114 B.R. at 641 (capitalization omitted). *See also Black's Law Dictionary* at 1090 (5th ed. 1979) ("Profits are divided into *profits à prendre* [a right to make some use of the soil of another] and *profits à rendre (q.v.)* [which comprehends rents and services].")

Although "rent" has no defined meaning in the Bankruptcy Code of which the Court is aware, it is neither a novel nor ambiguous concept. Rent has been defined as "[c]onsideration paid for use or occupation of property. In a broader sense, it is the compensation or fee paid, usually periodically, for the use of any property, land, buildings, equipment, etc." *Black's Law Dictionary* at 1166 (5th ed. 1979). As commonly understood, rent could encompass payments made for the use of another's property whether real or personal. *See Webster's Third New International Dictionary of the English Language Unabridged* at 1923 (1981). Thus, the many courts that dismiss the ability of hotel room revenue to constitute "rents" under section 552(b) because under various state laws the term "rents" applies only to real estate in relation to a lease, unnecessarily confuse the issue. *See* note 8 *infra* for a list of cases that discuss state law distinctions between lease and license in order to define "rents" under the Bankruptcy Code. As set forth above, state law is relevant only under the "nonbankruptcy" prong of the section 552(b) inquiry. It may be that the meaning of "rents" as enacted by Congress in section 552(b) does not encompass revenue generated from the use of hotel rooms (and this Court so holds as outlined below), but state law is not determinative.

Where the secured property is real estate, section 552(b) should not acquire a meaning such that "rents" and "profits" are redundant. To qualify as "rents," a transaction in secured property would necessarily require a transfer of a proprietary interest in the collateral as opposed to mere use—in order to contrast that transaction from a bailment for hire, a license, or the like. Profits, on the other hand, appear limited to the benefit, advantage, or pecuniary gain accruing to the owner or occupant of real estate from its actual use; provided that the gain does not arise from a proprietary transfer of a real estate interest. *See Black's Law Dictionary* at 1090 (5th ed. 1979).

In this case, there is no evidence of a proprietary transfer of any interest in the underlying mortgaged hotel real estate in conjunction with the rental of hotel or banquet rooms. The only transfer that arguably has been made in the rental of the hotel space is a transfer of a possessory interest, as in that accruing to a bailee or licensee. Without any showing of a transfer of a proprietary interest, the term "rents" as used in section 552(b) will not encompass hotel room revenues and receipts.

### D. "Profits" of Mortgaged Hotel Real Estate.

The court in *In re Miami Ctr. Assocs., Ltd.,* 144 B.R. 937 (Bankr.S.D.Fla.1992) has recognized that the "characterization [by state law] . . . of hotel revenue as accounts receivable rather than rents does not answer whether such hotel revenue can be construed

as 'proceeds' or 'profit' derived from the underlying hotel property ... under the exception provided by § 552(b)...." 144 B.R. at 941. The *Miami Ctr.* court relied on the plain language approach of *Mid–City Hotel* to conclude that "[g]iven the unique nature of hotel financing, [and] the fact that the bulk of hotel revenue is generated from the use of rooms (as opposed to services) ... the better view is that § 552(b) extends [a secured creditor's] prepetition lien to postpetition hotel revenue" as "profit" regardless of whether hotel revenue is characterized as accounts receivable under state law. 144 B.R. at 941. *But compare In re Investment Hotel Properties, Ltd.,* 109 B.R. 990, 994–96 (Bankr. D.Colo.1990) (rejecting a "broad interpretation" of the term "profits" since it would contravene the purpose behind the fresh-start approach of section 552(a)). *Compare also In re Investment Hotel Properties,* 109 B.R. at 994–96 ("Congressional intent is to interpret the term proceeds broadly, hence, the interpretation of profits is narrowed" such that "profits" "refers to the real property interest" while "proceeds" refers to personal property.) *with* H.R.Rep., No. 595, 95th Cong., 1st Sess. 376–77 (1977), 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6333 ("The term 'proceeds' is not limited to the technical definition of that term in the UCC, but covers *any* property into which property is converted.") (emphasis added).

Unlike the rationale of *Mid–City Hotel* and *Miami Ctr., supra,* the Ninth Circuit Bankruptcy Appellate Panel in the case of *In re Northview Corp.,* 130 B.R. 543 (9th Cir. BAP 1991) adopted a narrow interpretation of section 552(b). That panel held "that Bankruptcy Code § 552(b) bars [a creditor's] assertion of its [UCC perfected] security interest over hotel revenues generated after the filing of the bankruptcy petition." *Northview,* 130 B.R. at 549. The panel adopted this all-or-nothing approach despite its recognition that the Bankruptcy Code's use of terms such as "rents" and "offspring" "are certainly related to and flow out of prepetition collateral ...," though are different from the type of property encompassed by the terms "proceeds," "products," and "profits." *See Northview,* 130 B.R. at 548. The panel held that as to "proceeds," "prod-

ucts," and "profits," section 552(b) preserves the "viability of security interests which attached to pre-petition collateral notwithstanding that the collateral might subsequently be converted into a different form." *Northview,* 130 B.R. at 548. In doing so the panel blended, incorrectly in this Court's view, the conversion aspect of the technical meaning of "proceeds" into the meaning of "product" and "profits" which are very different terms of art.

Specifically, the *Northview* panel reasoned that as "the legislative history indicates '[t]he term "proceeds" is not limited to the technical definition of that term in the UCC ..., but covers any property into which property is *converted* ...,' " then likewise before "products" or "profits" could qualify as section 552(b) property they must have that element of "conversion" as well. *See Northview,* 130 B.R. at 548 (emphasis added). Since under the panel's interpretation of hotel room revenue, hotel room revenue did not have this crucial conversion attribute, it could not qualify as section 552(b) property.

The problem with *Northview's* reasoning, of course, is that there is nothing in the ordinary interpretation of "product" or "profits" of the debtor's secured property that limits the scope of those terms to types of property that need a "conversion" before they come into being. Conversion is the crucial element of proceeds. If "product" or "profits" under section 552(b) also are merely types of "converted" property, then they become redundant classifications of specific types of converted property because, as outlined above, "proceeds" under the Bankruptcy Code includes the conversion of "any" property not merely personal property. *But see In re Investment Hotel Properties, Ltd.,* 109 B.R. 990, 996 (Bankr.D.Colo.1990) (implying a contrary result, but not discussing the legislative history to section 552(b)). One might ask, what "conversion" need a landlord effectuate postpetition that it did not undertake prepetition in order to receive "profits"—or "products" for that matter? Surely *Northview* creates an artificial construct limiting the meaning of 552(b) property that is both difficult to apply and difficult to justify merely to frustrate the expecta-

tions of the parties to a prepetition consensual security agreement otherwise governed by applicable state law.

Unlike "rents," the term "profits" as used in section 552(b) of the Bankruptcy Code is broad enough to cover hotel room revenues and receipts even though there has been no execution of a lease or evidence of a proprietary, as opposed to a possessory, transfer of the mortgaged real estate. *See* the definition of profits set forth in section V (C) *supra.* Certainly there has been a pecuniary gain from Park Imperial's actual use of the real estate space of the hotel and banquet rooms. An expansive interpretation of the term "profits" in section 552(b) allows for full collateralization of income producing real estate, recognizes the economic realities of lending practices in the real estate industry,[4] and prevents "a party from receiving a 'windfall merely by reason of the happenstance of bankruptcy.'" *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) (quoting *Lewis v. Manufacturers Nat'l Bank,* 364 U.S. 603, 609, 81 S.Ct. 347, 350, 5 L.Ed.2d 323 (1961)). A plain-language interpretation of the term "profits" in section 552(b) avoids creating any greater "extinguishing" effect than necessary and shifts the determinative inquiry back to state law where it belongs.[5] Accordingly, this Court holds that the term "profits" in section 552(b)

of the Bankruptcy Code is broad enough to include hotel room revenues and hotel room receipts.

A plain-language approach to the federal interpretation of section 552(b) property shifts the onus of determining perfection priorities to the states. In this manner ambiguity in federal bankruptcy law will not unduly prohibit a financier from attempting to secure a priority position on a widely-used type of real estate collateral, but will not guarantee to that financier any postpetition position unless state law also allows it.

It may be that state law might treat hotel room revenue as a hereditament of realty transferring a possessory interest in the underlying realty every time a room is let, or that state law might treat it as money due from a service in the form of accounts receivable, or simply cash. Whatever the state law treatment of this unique form of property, and whatever perfection priorities that local policy-makers wish to enact, section 552(b) of the Bankruptcy Code should not be interpreted to unnecessarily extinguish the state's incentive system for real estate finance in the secured lending context without the benefit of a clear expression of congressional intent. It may be that states, particularly those whose economies rely heavily on the tourist trade, will make a policy choice to enable

4. *See In re S.F. Drake Hotel Assocs.,* 131 B.R. 156, 160 (Bankr.N.D.Cal.1991) ("The value of the income stream ... is a major factor in determining the value of the real property. The income is what the debtor and the secured lender look to for payment of the loan. To subtract room revenue from the consensual real property security greatly reduces the value of the creditor's collateral package."), *aff'd,* 147 B.R. 538 (N.D.Cal.1992). Craig H. Averch, "The Heartbreak Hotel for Secured Lenders: When Postpetition Revenue from a Hotel is not Subject to a Prepetition Security Interest," 107 *Bank.L.J.* 484, 484 n. 1 and accompanying text (1991).

5. The many variations to the use of real estate mitigate against a narrow interpretation of 11 U.S.C. § 552(b). Like many states, Ohio makes elaborate distinctions in the categorization of real estate uses. If the federal demarcation between rents and profits of secured property depended on state law alone, a consistent approach to section 552(b) questions would become definitionally troublesome. *Compare* Hotels, Ohio Rev.Code ch. 3731; hospitals and health care

facilities, Ohio Rev.Code chs. 3701 & 3727; maternity boardinghouses, Ohio Rev.Code ch. 3711; hospice facilities, Ohio Rev.Code ch. 3712; rest homes and nursing homes, Ohio Rev.Code ch. 3721; adult care facilities, Ohio Rev.Code ch. 3722; community alternative homes, Ohio Rev. Code ch. 3724; manufactured homes and agricultural labor camps, Ohio Rev.Code ch. 3733; institutions for children, Ohio Rev.Code § 5103.03; adult foster care facilities, Ohio Rev. Code § 5103.31; condominiums, Ohio Rev.Code ch. 5311; residential premises, Ohio Rev.Code § 5321.01; and storage facilities, Ohio Rev.Code ch. 5322.

A broad interpretation of "profits" shifts the question of postpetition enforceability of security interests in hotel room revenue to the nonbankruptcy law of the states which deals with perfection. As stated by *In re S.F. Drake Hotel Assocs.,* 147 B.R. 538 (N.D.Cal.1992), "this court is persuaded ... a common sense interpretation of § 552(b) yields an answer contrary to that reached by other courts that have addressed this issue." 147 B.R. at 539, *aff'g,* 131 B.R. 156 (Bankr.N.D.Cal.1991).

commercial lenders to retain a priority position in postpetition cash collateral from hotel room revenues. It may be that they won't. Whatever the local choice, there has to be a more persuasive showing than has been made here to conclude that Congress, when deciding to enact the section 552(b) exception, intended to deprive the states from allowing creditors, under any circumstances, from securing a postpetition priority position in the income producing revenue from the use of real estate in which a security interest may be had. *Cf.* 11 U.S.C. § 363(e) (entitling secured parties to adequate protection).

Finally, courts which choose something other than a plain-language interpretation of section 552(b) property perhaps distrust the careful discretion entrusted to the bankruptcy court under that section which when exercised may avoid postpetition security interests "based on the equities of the case." 11 U.S.C. § 552(b). *Cf. United Virginia Bank v. Slab Fork Coal Co.*, 784 F.2d 1188, 1191 (4th Cir.) (Section "552(b) gives the bankruptcy court considerable latitude in applying pre-petition security interests to post-petition proceeds[, products, offspring, rents or profits]."), *cert. denied*, 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986). "The purpose of the equity exception is to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the trustee's/debtor-in-possession's use of other assets of the estate (which would normally go to general creditors) to cause the appreciated value." *Delbridge v. Production Credit Ass'n & Fed. Land Bank*, 104 B.R. 824, 826 (E.D.Mich.1989) (citing S.Rep. No. 989, 95th Cong., 2d Sess. 91, *reprinted in* 1978 *U.S.Code Cong. & Admin.News* 5787, 5877). If the circumstances of the case indicate that the expectations of the general creditors have been frustrated by section 552(b) then the bankruptcy judge should "find an appropriate balance between the rights of the secured creditors and the rehabilitative purposes of the Bankruptcy Code." *United Virginia*, 784 F.2d at 1191.

A holding that section 552(b) is broad enough to encompass different state approaches to real estate finance does not decide the entire question on appeal to this Court, however. As set forth above, section 552(b) mandates inquires into bankruptcy and "applicable nonbankruptcy law." The second inquiry still remains to be considered, namely, whether nonbankruptcy law, in light of any security agreement entered into by Great–West and Parke Imperial, preserved Great–West's asserted security interest in hotel room revenues derived from the mortgaged real estate.

## VI. PERFECTION OF SECURITY INTERESTS IN HOTEL ROOM REVENUES UNDER OHIO LAW

■ In Ohio as elsewhere, a security interest is created by nothing more than an written agreement to pledge collateral to secure a debt. *See generally Silver Creek Supply v. Powell*, 36 Ohio App.3d 140, 144, 521 N.E.2d 828 (1987) (no specific formalized document is necessary). In the general business context, as defined by UCC § 1–201(37), a security interest is "an interest in personal property or fixtures which secures payment or performance of an obligation." *See* Ohio Rev.Code § 1301.01(KK)(1) (same). For claims governed by Ohio law, Article 9 of the UCC as enacted in Ohio—Ohio Revised Code sections 1309.01 to 1309.50—outlines much of the law governing secured transactions, but it does not govern all security interests.

In particular, Ohio Revised Code sections 1309.01 to 1309.50, do not apply "to the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder," Ohio Rev.Code § 1309.04(I), except for security interests in those goods which become so related to particular real estate that they become fixtures. Ohio Rev.Code § 1309.32(A). Otherwise, Article 9 governs "(1) ... any transaction, regardless of its form, which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper, or accounts; and also (2) ... any sale of accounts or chattel paper." Ohio Rev.Code § 1309.02(A). In this case, the parties dispute the applicability of Article 9 to the creation and perfection of security interests in hotel room revenues in Ohio.

*A. The Attachment and Creation of Security Interests in Hotel Room Revenue.*

The preliminary judicial inquiry into the validity of a security interest addresses two questions: has a security interest been created, and if so, has it been perfected. Both questions are relevant in this appeal because the Bankruptcy Court below held that Great–West "held no security interest in the postpetition receipts of [Park Imperial]." (Order Sept. 1, 1993). The bulk of the decision of the Bankruptcy Court focused on the second question, perfection, and gave short shrift to Great–West's contention that the parties to the 1974 Mortgage and Assignment of Rents, the 1983 Modification of Mortgage, and the May 1992 Financing Statement intended to create a security interest in the debtor's banquet room and hotel room revenues.

For security interests governed by Article 9, the question of creation is the question of "attachment." Ohio Rev.Code § 1309.14. For such UCC interests, three conditions must be met before they may be enforceable against anyone, including the debtor. First, unless the secured party possesses the collateral, there must be a written security agreement signed by the debtor and containing a description of the collateral. Second, the secured party must have given value. And third, the debtor must have "rights in the collateral." Ohio Rev.Code § 1309.14(A)(1) (2) & (3). *Compare also* Ohio Rev.Code § 1309.08 (sufficiency of description of the collateral). For security interests not covered by Article 9, their creation is a matter of the statutory and common law of Ohio contracts.

In this case Bankruptcy Court assumed that "Great–West possessed a perfected security interest in the Debtor's [hotel room] receipts prior to the bankruptcy filing...." Mem. of Decision at 3 & 9. There is evidence to indicate that the original mortgagee (Citizens) and its assignee Great–West created a security interest in the income producing revenue from hotel room receipts stemming from Imperial Motel's, and later Parke Imperial's, use of the mortgaged hotel property. Had the Bankruptcy Court addressed the issue, the documentary evidence potentially could support a finding that the parties'

intended to fully collateralize their $2.5 million investment by encumbering the banquet room revenue and hotel room revenue of the mortgaged property through the use of "rents, issues or profits" language. *Compare In re Davis,* 989 F.2d 208, 212–13 (6th Cir. 1993) (The boilerplate phrase "rents, royalties, profits, and fixtures" included in a mortgage or deed of trust "refers to benefits which are merely incidental to an interest in real property ...;" and as appellant's security interest did not extend "beyond items which are inextricably bound to the real property itself as part of the possessory bundle of rights," appellant did not have an interest in additional security pursuant to 11 U.S.C. § 1322(b)(2).). Although this Court finds it inappropriate to make a factual finding on this issue, it will assume for purposes review (as did the court below) that Imperial Motel, Citizens and Great–West, and later Parke Imperial, sufficiently described the collateral and otherwise properly created a security interest in the banquet room and hotel room revenue through the execution of the Mortgage and Assignment of Rents in February 1974 and the 1983 Modification of Mortgage.

*B. The Perfection of Ohio Security Interests in Hotel Room Revenue.*

Although it is attachment that gives a secured party property rights in the collateral enforceable against the debtor, it is perfection that the gives the secured party rights against conflicting claims of third parties. Where a security interest is governed by Article 9 of Ohio's UCC, perfection requires the proper filing of a financing statement. *See* Ohio Rev.Code § 1309.39 (formal requisites of financing statements). Subject to limited exceptions, where filing is proper, the security interest reflected by the financing statement remains effective for five years. Ohio Rev.Code § 1309.40.

Under Ohio Revised Code section 1309.38(A)(4), the proper place to file in order to perfect a security interest for Article 9 collateral other than consumer goods, timber and minerals, or farm collateral, is "in the office of the secretary of state and, in addition, if the debtor has a place of business in

only one county of this state, also in the office of the county recorder of such county...." [6]

For security interests that fall outside the scope of Ohio's UCC by virtue of "the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder," the secured party who properly records his encumbrance on registered land or any interest therein with the office of the county recorder where the land is situated has priority over any later filed encumbrance. *See* Ohio Rev.Code §§ 5301.23, 5301.25, & 5310.02.[7]

Here, there is evidence to suggest that prior to Parke Imperial's Chapter 11 filing, Great–West maintained a priority position to the "rents, issues and profits" of Parke Imperial's mortgaged hotel property to the extent that Great–West's encumbrance concerned "the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder." *See* Ohio Rev.Code § 1309.04(I) (excluding such property from Article 9 filing requirements). Whether Great–West's 1974, 1983 and 1992 documents created "an interest in or lien on" real estate, a real estate lease, or real estate rents, is the determinative question, however. Regardless of whether the parties to the security

agreement intended to encumber Parke Imperial's hotel room receipts, their agreement would be ineffective against others unless they properly perfected that interest in accordance with governing Ohio law.

## C. Ohio Interests in Real Estate Including Leases or Rents.

The court below aptly summarized two approaches to the question of the perfection of security interests in hotel room revenues in states following the UCC:

> The split of authority runs along an identifiable line. The cases which treat hotel room receipts as stemming from an interest in real estate look to the parties' intent and to that which the hotels' customers receive, i.e., living quarters for a period of time.... Those cases which take the opposing view look to the legal relationship between hotel operators and their customers vis-a-vis the landlord and tenant relationship. Additionally, the terms employed (rents, issues and profits) are viewed as terms of art in the context of real estate law....

Mem. of Decision at 6–7 (citations omitted).[8]

Using this dichotomy as a starting point, it becomes apparent that in Ohio the genera-

---

6. Ohio Revised Code section 1309.44(D) provides a limited exception to Article 9 concerning the scope of a secured party's rights upon default where the security agreement covers both real and personal property; but section 1309.44(D) does not alter the law governing priority disputes between creditors concerning Article 9 collateral.

7. Ohio Revised Code § 5309.47 provides that a registered, mortgaged, real estate interest "shall operate as a lien or charge upon and bind the land covered thereby for the period ending twenty-one years after the maturity of the last secured debt or obligation," which shall expire if not renewed during the one year before the elapse of the twenty-one year period.

8. Compare the cases in the first category which concentrate on the real estate relationships: *In re S.F. Drake Hotel Assocs.*, 131 B.R. 156 (Bankr. N.D.Cal.1991), *aff'd,* 147 B.R. 538 (N.D.Cal. 1992); *In re Miami Ctr. Assocs., Ltd.*, 144 B.R. 937 (Bankr.S.D.Fla.1992); *In re T–H New Orleans Ltd. Partnership*, 144 B.R. 327 (Bankr. E.D.La.1992); *In re Mid–City Hotel Assocs.*, 114 B.R. 634 (Bankr.D.Minn.1990); with the majority of cases in the second which emphasize the service link: *United States v. PS Hotel Corp.*, 404

F.Supp. 1188 (E.D.Mo.1975), *aff'd,* 527 F.2d 500 (8th Cir.1975) (per curiam); *In re James River Assocs.*, 156 B.R. 494 (E.D.Va.1993); *In re Green Corp.*, 154 B.R. 819 (Bankr.D.Me.1993); *In re General Associated Investors Ltd. Partnership*, 150 B.R. 756 (Bankr.D.Ariz.1993); *In re Northview Corp.*, 130 B.R. 543 (9th Cir. BAP 1991); *In re Majestic Motel Assoc.*, 131 B.R. 523 (Bankr. D.Me.1991); *In re GGVXX*, 130 B.R. 322 (Bankr. D.Colo.1991); *In re Nendels–Medford Joint Venture*, 127 B.R. 658 (Bankr.D.Or.1991); *In re Ashoka Enters., Inc.*, 125 B.R. 845 (Bankr.S.D.Fla. 1990); *In re Shore Haven Motor Inn, Inc.*, 124 B.R. 617 (Bankr.S.D.Fla.1991); *In re Sacramento Mansion, Ltd.*, 117 B.R. 592 (Bankr.D.Colo. 1990); *In re Airport Inn Assocs., Ltd.*, 132 B.R. 951 (Bankr.D.Colo.1990); *In re Oceanview/Virginia Beach Real Estate Assocs.*, 116 B.R. 57 (Bankr.E.D.Va.1990); *In re Vickers, Ltd.*, 111 B.R. 332 (D.Colo.1990); *In re Investment Hotel Properties, Ltd.*, 109 B.R. 990 (Bankr.D.Colo. 1990); *In re Blue Ridge Motel Assocs.*, 106 B.R. 81 (Bankr.W.D.Pa.1989); *In re Ashkenazy Enters., Inc.*, 94 B.R. 645 (Bankr.C.D.Cal.1986); *In re Kearney Hotel Partners*, 92 B.R. 95 (Bankr. S.D.N.Y.1988); *In re Greater Atl. & Pac. Inv. Group*, 88 B.R. 356 (Bankr.N.D.Okl.1988). *See*

tion of hotel room revenues and receipts do not "creat[e] or transfer ... an interest in or lien on real estate, including a lease or rents thereunder." Ohio Rev.Code § 1309.04(I). As such Article 9 of Ohio's UCC is the applicable nonbankruptcy law that governs the continuation, postpetition, of security interests in banquet room revenue and hotel room revenue under 11 U.S.C. § 552(b).

■ First, Ohio defines hotel to include

any structure ... kept, used, maintained, advertised, or held out to the public to be a place where sleeping accommodations are offered for pay to transient guests for a period of thirty days or less; [or]

[t]hose facilities specifically ... kept ... and held out to the public to offer a temporary residence to persons either relocating their residence in an area or on temporary work assignment in an area[; but] ... does not include ... apartment houses, lodging houses, [or] rooming houses....

Ohio Rev.Code § 3731.01(A)(B) (Supp.1993). Under Ohio law, persons staying in hotels acquire no greater rights than those acquired by a "guest." *See Ripple v. Mahoning Nat'l Bank,* 143 Ohio St. 614, 619–20, 56 N.E.2d 289, 291 (1944). Such a guest is a mere licensee and acquires rights without passing any proprietary interest in the land. *Id.* The "transient" nature of stays in "hotels" as opposed to those undertaken in apartment houses, lodging houses, or rooming houses supports an interpretation under Ohio law that a mutual agreement to let a hotel room does not "create or transfer an interest in real estate."

Second, the provision of Ohio Revised Code § 1309.04(I) which exempts "a lease or rents thereunder" from Article 9 makes sense only in reference to the preliminary question of the "creation or transfer" of a real estate interest. Certainly a security interest in a mere lease or rental of personal property, such as a car, would not be exempt from Article 9. Likewise, even though it is commonly said that one might "rent" a hotel room, the mere recognition that the act constitutes a "rental" does not mean that the act

"creates or transfers" an interest in real estate. The two are separate inquiries. If one cannot establish that his transaction "created or transferred" and interest in real estate, then there can be no creation or transfer of a "lease or rents" under that real estate interest.

When a patron of an Ohio hotel acquires the rights of a "transient" "guest" upon striking a bargain to stay at the hotel, the patron does not acquire any interest in the real estate, but is a mere guest licensee. Since the rental of a hotel room does not equate with the rental of a real estate interest in Ohio, any security interest created in the revenue collected from that transaction remains governed by Article 9. This Court agrees with the Bankruptcy Court below in that Great West could perfect a security interest in Park Imperial's hotel room revenue only by complying with the requirements of Article 9 of Ohio's UCC, Ohio Revised Code §§ 1309.01 to 1309.50.

*D. Perfection of a Security Interest in Debtor's Hotel Room Revenue.*

■ Great–West maintains that the Bankruptcy Court erred in refusing to address whether its filing of its May 1992 financing statement with the Ohio Secretary of State adequately perfected a security interest in Park Imperial's banquet room revenue and hotel room revenue under Ohio Revised Code § 1309.38(A)(4). On the other hand, Parke Imperial insists that Great–West's filing of its May 1992 financing statement did not comply with Ohio Revised Code § 1309.38(A)(4) because Parke Imperial has only one place of business in Ohio and because this financing statement misidentifies Park Imperial. Although Parke Imperial makes a persuasive argument in light of the current record, the Court finds it appropriate to have the benefit of a review by the Bankruptcy Court in the first instance.

**VII. CONCLUSION**

For the reasons set forth above, the September 1, 1993 Memorandum of Decision and Order of the Bankruptcy Court is affirmed in

---

*also In re Anderson,* 22 B.C.D. 1020 (Bankr. D.Colo.1992) (using hotel revenues as an analo-

gy, the income from a debtor's feedlot was held not to be "rent" under section 552(b)).

part, reversed in part, and remanded for proceedings consistent with this opinion. On remand the Bankruptcy Court should determine the nature and scope of the security agreements entered into between Great–West and Parke Imperial, including the adequacy of the description of the collateral. As well, the Bankruptcy Court should address whether the filing of Great West's financing statement is sufficient under Ohio Revised Code § 1309.38(A)(4); and, if necessary, whether the equitable exception to 11 U.S.C. § 552(b) should apply to this case.

IT IS SO ORDERED.